**NATIONAL WILDLIFE FEDERATION**
**and the Wilderness Society, Plaintiffs,**

v.

**James G. WATT, Defendant.**

**Civ. A. No. 83–2648.**

United States District Court,
District of Columbia.

Sept. 28, 1983.

Memorandum with Respect to
Preliminary Injunction Oct. 6, 1983.

1146

G. Robert Witmer, Jr., Rochester, N.Y., Jane E. Kirtley, Nixon, Hargrave, Devans & Doyle, Norman L. Dean, Jr., Nat. Wildlife Federation, Washington, D.C., for plaintiffs.

F. Henry Habicht, II, Acting Asst. Atty. Gen., Robert D. Daniel, Sp. Lit. Counsel, Michael Reed, Peter R. Steenland, Jr., Land & Natural Resources Div., Washington, D.C., for defendant.

John A. Macleod, Timothy M. Biddle, David B. Siegel, Crowell & Moring, Washington, D.C., for defendants-intervenors North American Coal Corp., Falkirk Mining Co., Missouri Valley Properties Co., and Baukol-Noonan, Inc.

Stanley M. Brand, Gen. Counsel to the Clerk, Steven R. Ross, Deputy Counsel to the Clerk, Michael L. Murray, Asst. Counsel to the Clerk, U.S. House of Representatives,

Washington, D.C., for plaintiff-intervenor Morris K. Udall.

## PRELIMINARY INJUNCTION

OBERDORFER, District Judge.

This is an action by plaintiffs against the Secretary of Interior to declare illegal and to enjoin his planned issuance of leases to certain coal lands in Montana and North Dakota. The Honorable Morris Udall, Chairman of the House Interior and Insular Affairs Committee, has intervened as a plaintiff. Potential lessees have intervened as defendants.

At issue is the legality of the Secretary's refusal to withhold issuance of the leases as required by section 204(e) of the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1714(e), and a parallel Department of Interior regulation. 43 C.F.R. § 2310.5. Both section 204(e) and the regulation require the Secretary temporarily to withhold public lands from sale or lease when requested to do so by the House Committee. Although defendant has not rescinded the regulation, nor conducted notice and comment with respect to recission of it, he justified his refusal to abide by it on the ground that he had been advised by his general counsel and by the Office of Legal Counsel of the Department of Justice[1] that the Supreme Court's recent decision in *INS v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), invalidated both the statute and the regulation. *See* letter from Secretary Watt to Chairman Udall (Sept. 9, 1983) (Attachment A to Defendant's Memorandum Opposing Motion for Preliminary Injunction).

After consideration of briefs of the parties, and an excellent oral argument, and for reasons more fully stated in a Memorandum to be filed, the Court concludes that:

■ 1. Chairman Udall has standing to sue to vindicate his interest as a Congressman and as a Committee Chairman in seeking to compel the defendant to honor a resolution adopted by his Committee pursuant to section 204(e). *See American Federation of Government Employees v. Pierce,* 697 F.2d 303, 305 (D.C.Cir.1982). This standing, coupled with the plaintiff organizations' interest in preservation of the land sought to be leased, give the organizations standing also. *See Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981).

■ 2. Plaintiffs are likely to prevail on the merits because defendant is obligated to apply his own regulation, unless and until it is rescinded after he affords notice and an opportunity to comment. *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

■ It is not at all clear that section 204(e) and the regulation are void. Indeed, they may well be authorized by Article IV, Section 3, of the Constitution, independently of Article I, the subject of the *Chadha* decision.

As the Supreme Court has stated:

Congress not only has a legislative power over the public domain, but it also exercises the powers of a proprietor therein. . . . Like any other owner it may provide when, how, and to whom its land can be sold.

*United States v. Midwest Oil Co.,* 236 U.S. 459, 474, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915); *see also Kleppe v. New Mexico,* 426 U.S. 529, 536–43, 96 S.Ct. 2285, 2290–93, 49 L.Ed.2d 34 (1976). It may well be held that the statute requiring the Secretary temporarily to withdraw lands at the request of a designated congressional committee in order that Congress may reexamine the leasing process after an impending recess is an appropriate exercise of the proprietary power, as distinguished from legislative power, created in Congress by Article IV, Section 3.

Dictum in *United States v. California,* 332 U.S. 19, 28, 67 S.Ct. 1658, 1663, 91 L.Ed.

---

1. *Compare* 28 U.S.C. § 512 authorizing the head of an executive department to "require the opinion of the Attorney General on questions of law arising in the administration of his department."

1889 (1947), relied upon by defendant, is not controlling here. That original action involved the question of whether California or the United States "owns or has paramount rights in and power over several thousand square miles of land under the ocean off the coast of California." *Id.* at 24–25, 67 S.Ct. at 1661. In deciding that the Congress had not precluded the Attorney General from prosecuting that original action, the Court recognized that only a formal Act of Congress pursuant to Article IV could divest the Attorney General of his authority to sue. But the *California* opinion went on to note with respect to Congress' Article IV power:

> We have said that the constitutional power of Congress in this respect is without limitation .... Thus neither the courts nor the executive agencies, could proceed contrary to an Act of Congress in this congressional area of national power.

*Id.* at 27, 67 S.Ct. at 1663. Congress enacted section 204(e) and a President signed it. It is an Act of Congress "in this congressional area of national power." One provision requires the Secretary to withhold leasing temporarily at the request of the House Committee. The *California* opinion may well presage a decision that neither the defendant nor the courts may "proceed contrary" to that statute.

Moreover, even if portions of section 204(e) are unconstitutional, the independent discretion given to the Secretary by section 204(e) to withdraw the land probably preserved the regulation, unless and until the Secretary rescinded it after notice and comment. In these circumstances, his failure to honor the regulation probably violated the Administrative Procedure Act, 5 U.S.C. § 553. *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).[2]

█ 3. Issuance of the leases, or any other change in the *status quo,* would irreparably injure plaintiff Udall's interest in vindication of his prerogatives as a Committee Chairman and as a Member of the House, and would leave the other plaintiffs at risk of irreparable injury to their interests in protection of environmental values in the land.

4. Defendants' interests in issuance of the leases during fiscal 1983 where pending legislation might preclude or delay their issuance in fiscal 1984 are outweighed by the interests of the plaintiffs and by the public interest. That interest is authoritatively expressed by the 1976 Act, the Committee Resolution, a recent Act of Congress requiring a Commission to study coal leasing procedure (Pub.L. No. 98–63, July 30, 1983), and similar bills passed by both Houses of Congress (*see* 129 Cong.Rec. S 12,486–95, Sept. 20, 1983) and now reportedly under consideration by a Conference Committee which, if enacted, would declare a moratorium on such leases during fiscal 1984.

Accordingly, it is this 28th day of September, 1983, hereby

ORDERED: that pending a decision on the motions for summary judgment, unless this order is sooner dissolved, and without plaintiffs being required to give security therefor, the defendants, their agents, servants, employees, attorneys, and representatives shall be stayed, enjoined, and restrained from issuing to, entering into, or otherwise vesting in any person rights to coal leases for tracts in the Fort Union Coal Region; and it is further

ORDERED: that defendant's protective motion for a stay pending appeal is DENIED.

---

**2.** Defendant also claims that even if section 204(e) and the regulation are valid, the September 9 letter is the functional equivalent of the report required of him by section 204(e), as more fully described in section 204(c)(2). The Court has compared the September 9, 1983, letter with an Interior Department report on an emergency withdrawal of land forwarded to the House Committee on September 10, 1981, with respect to what appears to be proposed leasing of other Montana lands at issue in *Pacific Legal Foundation v. Watt,* 529 F.Supp. 982 (D.Mont. 1982). The comparison demonstrates the apparent failure of the September 9 letter to comply with the requirements of section 204(c)(2).

## MEMORANDUM WITH RESPECT TO PRELIMINARY INJUNCTION [1]

### I

Plaintiffs National Wildlife Federation and The Wilderness Society brought this suit on September 8, 1983, against defendant Secretary of the Department of the Interior. Plaintiffs seek a declaratory judgment holding illegal the Secretary's plan to lease for coal mining certain tracts of federal lands in the Fort Union Federal Coal Production Region in eastern Montana and western North Dakota. Plaintiffs also seek appropriate injunctive relief. They filed the suit after defendant gave notice of his intention to receive and accept bids for the sale of coal leases in the region despite a Resolution adopted by the Interior and Insular Affairs Committee of the House of Representatives on August 3, 1983, pursuant to section 204(e) of the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1714(e). That Resolution directed the Secretary to withdraw the Fort Union lands from coal leasing temporarily. The Honorable Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs, has intervened as a plaintiff pursuant to Rule 24 of the Federal Rules of Civil Procedure. Four coal companies that successfully bid for the Fort Union tracts have intervened as party defendants.[2]

The complaint alleges that the issuance of the leases disregards and violates the Resolution, and is therefore arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. Plaintiff-intervenor Udall claims that the defendant's refusal to honor the Resolution and his decision that section 204(e) is void injures Udall's interest as Committee Chairman and as a Congressman in the exercise of specific authority vested in him by law. The plaintiff organizations claim that their members will be adversely affected in their recreational, aesthetic, hunting, and fishing use of the Fort Union region. All plaintiffs claim that opening of the region to coal leasing will result in air pollution, the loss of wildlife habitat, and the deterioration of the aesthetic and recreational values of the region and surrounding areas.

The complaint was accompanied by an application for a temporary restraining order and a motion for a preliminary injunction. These motions alleged that defendant intended to offer leases for bid on September 14. On September 9 the Court denied the application for a temporary restraining order on the understanding that no leases would be issued to successful bidders until 45 to 60 days after the September 14 bidding and that the parties had worked out a schedule for briefing and hearing dispositive motions toward the end of October. *See* Order (Sept. 14, 1983); *see also* Transcript at 11–15 (Sept. 9, 1983). In a letter dated September 15, however, defendant's counsel advised that defendant had accepted some bids and that he would issue leases to the successful bidders by September 30. Accordingly, the Court restrained the issuance of leases while the parties briefed and argued an expedited motion for a preliminary injunction. *See* Transcript (Sept. 16, 1983); Stipulation of Schedule and Temporary Restraining Order (Sept. 19, 1983).

Plaintiffs' motion for a preliminary injunction was supported by a factual affidavit and documentary evidence. Hastily prepared briefs were filed by plaintiffs, defendant, and plaintiff-intervenor. In addition, the Court was aided by excellent oral arguments by all counsel on September 27. Upon consideration of all submissions, the

---

1. An Order filed Sept. 28, 1983, preliminarily enjoining defendant from issuing certain coal leases referred to a Memorandum to be filed. *See* Order at —— (Sept. 28, 1983). This is that Memorandum. Oral argument was heard on Sept. 27, 1983; the injunction was issued as quickly as possible, without full explanation, in order to afford the losing party an opportunity to seek emergency appellate relief before the end of the fiscal year, Sept. 30, 1983.

2. Defendant-intervenors are the North American Coal Corp., which bid on the North Beulah tract (coal lease no. M59115); the Falkirk Mining Co., which bid on the Underwood tract (coal lease no. M59119); the Missouri Valley Properties Co., which bid on the Renner tract (coal lease no. M59118); and Baukol-Noonan, Inc., which bid on the Center tract (coal lease no. M59116).

Court was persuaded that there was substantial likelihood that plaintiffs would succeed on the merits, that without temporary relief plaintiffs would suffer irreparable injury, that defendant and defendant-intervenors would not suffer substantial harm from temporary relief and, finally, that such relief would be in the public interest. Accordingly, on September 28 the Court entered an order restraining defendant from issuing the leases in question pending a final decision on the motions for summary judgment.

## II

### A.

Article IV, Section 3, of the Constitution provides:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States
> . . . .

The Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.* ("1976 Act"), declared it the policy of the United States that, among other things:

> (1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest;

> \* \* \* \* \* \*

> (4) the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action;

> (5) in administering public land statutes and exercising discretionary authority granted by them, the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public . . .

> (6) judicial review of public land adjudication decisions be provided by law;

> \* \* \* \* \* \*

> (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

> (9) the United States receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute;

> \* \* \* \* \* \*

> (12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 . . . as it pertains to the public lands. . . .

Section 103(j) of the Act defines "withdrawal" as withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program. Section 204 governs withdrawals. Section 204(a) authorizes the Secretary

> to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section.

Section 204(e), at issue here, provides in relevant part that

> When the Secretary determines, or when the Committee on Interior and Insular Affairs of either the House of Representatives or the Senate notifies the Secretary, that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost, the Secretary . . . shall immediately make a withdrawal . . . . Such emergency withdrawal shall be effective when made but shall last

only for a period not to exceed three years .... ·.

Section 310 of the Act gives the Secretary broad authority to promulgate regulations, in the manner prescribed by the Administrative Procedure Act:

The Secretary, with respect to the public lands, shall promulgate rules and regulations to carry out the purposes of this Act .... The promulgation of such rules and regulations shall be governed by the provisions of chapter 5 of Title 5, without regard to section 553(a)(2).[3]

Pursuant to this rule-making authority, the Secretary promulgated a regulation governing his response to a notice from committees in the House or Senate of an emergency requiring a temporary withdrawal of land from leasing. That regulation provides in relevant part:

(a) When the Secretary determines, or when either one of the two Committees of the Congress that are specified in section 204(e) of the act (43 U.S.C. 1714(e)) notifies the Secretary, that an emergency exists and that extraordinary measures need to be taken to protect natural resources or resource values that otherwise would be lost, the Secretary shall immediately make a withdrawal which shall be limited in its scope and duration to the emergency....

(b) When an emergency withdrawal is signed, the Secretary shall on the same day, send a notice of the withdrawal to the two Committees of the Congress that are specified for that purpose ....

(c) The Secretary shall forward a report to each of the aforementioned committees within 90 days after filing with them the notice of emergency withdrawal. Reports for all such withdrawals, regardless of the amount of acreage withdrawn, shall contain the information specified in section 204(c)(2) of the act (43 U.S.C. 1714(c)(2)).

43 C.F.R. § 2310.5. That regulation has not been rescinded by the Secretary through notice, comment, and reasoned decision.

B.

The Secretary's decision to bid and lease the Fort Union land for coal mining was preceded by an elaborate administrative process beginning in the late 1970's with the Federal Coal Management Program. The Program proceeded through several stages, including an environmental impact statement. In a report prepared in 1979, a Fort Union lease sale was called for in April 1982. *See* Federal Coal Management Report for Fiscal Year 1979. On November 6, 1980, in 45 Fed.Reg. 73,801, the then Secretary published a notice calling for expressions of leasing interest in the region, pursuant to his authority under the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 201.

Identification of the particular tracts to be leased in the Fort Union Region was conducted under the guidance of a Regional Coal Team (RCT).[4] In 1982, the RCT published an environmental impact statement specific to the Fort Union Region and subjected the statement to public comment.[5]

**3.** But for this proviso, 5 U.S.C. § 553(a)(2) might exempt withdrawals from APA scrutiny.

**4.** The Fort Union RCT is composed of the Governors of North Dakota and Montana, or their designated representatives, and the Bureau of Land Management state directors for those two states.

**5.** The *Fort Union Coal Tract Summaries* ("FUCTS") and the *Final Environment Impact Statement for the Fort Union Coal Region* ("FEIS"), both issued by the Bureau of Land Management of the Department of the Interior ... show the following for the five tracts on which bids were received:
a) Coal leasing and development in the maintenance tracts will have a significant impact on the local agriculture economics, potentially adversely affecting 70 agricultural operators (FUCTS pp. 114, 120, 126, 132, 182);
b) Coal leasing and development in the maintenance tracts will result in the probable violation of state and federal 24-hour maximum ambient air standards for Total Suspended Particulates ("TSP") and exceedance of the Class I 24-hour maximum Prevention of Significant Deterioration ("PSD") interval for sulfur dioxide and the Class II 24-hour maximum PSD interval for particulates in each tract (FUCTS pp. 113, 119, 125, 131, 181 and FEIS, p. S–43);
c) Coal leasing will cause the elimination of unique unfarmed wildlife habitat, high

On February 14, 1983, the final environmental impact statement was published. After balancing the environmental considerations, the RCT recommended and the defendant approved an offer of 790.2 million tons of coal for both production tracts and maintenance tracts.

In the year before the sale at issue, the Secretary auctioned leases for 1.5 billion tons of coal on approximately 32,000 acres in Montana and Wyoming. In May 1983, the General Accounting Office (GAO) reported that the Interior Department had issued those leases for $100 million less than the GAO's estimates of fair market value. *See* Comptroller General, Report to the Congress: Analysis of the Powder River Basin Federal Coal Lease Sale: Economic Valuation Improvements and Legislative Changes Needed (May 11, 1983). On July 30, 1983, Congress passed, and the President signed, an Act that ordered the Secretary to appoint a commission to review coal leasing procedures. The Commission was obligated to report to the Congress by January 1984 on methods to insure that fair market value is received for leases. Act of July 30, 1983, Pub.L. No. 98–63, 97 Stat. 328. During this same time, the House passed, but the Senate rejected, a provision in a supplemental appropriations bill that would have imposed a moratorium on coal leasing by the Department of the Interior. More recently the Senate has approved a counterpart to the coal leasing moratorium previously passed by the House as an element of the 1984 appropriations legislation. 129 Cong. Rec. S 12,486–95 (Sept. 20, 1983). The House and Senate versions are now before a Conference Committee.

The immediate actions leading up the current litigation began with an exchange of letters on August 2, 1983, between the Secretary and Chairman Udall. In his letter, the Secretary stated that he did not plan to postpone the sale of Fort Union leases previously scheduled for September 14.[6] The Chairman replied with a request for postponement pending committee review.[7] The Secretary then stated that any Committee resolution passed pursuant to section 204(e) would be treated as a request, not a directive.[8] On August 3, the Committee adopted a Resolution pursuant to which the Chairman notified the Secretary that an emergency situation existed and that the Fort Union tracts "are to be immediately withdrawn" from coal leasing.[9] Nevertheless, in two subsequent notices in the Feder-

density wetlands, native woodlands and remnant native prairie (FUCTS p. 109 and FEIS p. 123–24);

    d) The elimination of wildlife habitat, wetlands, woodlands and prairie due to the proposed coal leasing will significantly affect the wildlife in the area and the enjoyment thereof (FUCTS pp. 113, 119, 125, 131, 181 and FEIS p. 123–24);

    e) Between 45 and 162 local wells will be significantly impacted by the expanding mining in the five maintenance tracts (FEIS p. 64).

The TSP concentration caused by the proposed coal leasing and development will result in a negative impact to biota, public health and visibility in the Fort Union Coal Production region (FEIS p. SA–1).

Affidavit of G. Robert Witmer, Jr., in Support of Motion for Preliminary Injunction (para. nos. omitted).

**6.** Letter from Interior Department Secretary Watt to House Committee on Interior and Insular Affairs Chairman Udall (Aug. 2, 1983) (Exhibit D to Plaintiffs' motion for preliminary injunction).

**7.** Letter from Chairman Udall to Secretary Watt (Aug. 2, 1983) (Plaintiffs' exhibit E).

**8.** Letters from Secretary Watt to Chairman Udall (n.d.) (Plaintiffs' exhibit F).

**9.** Resolution of the Committee on Internal and Insular Affairs of the House of Representatives (Aug. 3, 1983). The Committee cited the following reasons, among others, for its finding of an emergency situation: the impact of rapid population expansion, increased air and water pollution, effect on agriculture, vegetation, and wildlife, jeopardization of cultural and archaeological sites, the current excess supply of coal for national needs, and the question of whether fair value would be received for the leases. In particular, the Committee pointed out that withdrawal would allow time for Congress to review the Department leasing procedure and to receive the Commission report on fair value in leasing.

al Register, the Secretary continued preparations for the September 14 sale.[10]

On September 9, 1983, the Secretary acknowledged by letter to Chairman Udall that he had received "the August 3, 1983 Resolution voted out of your Committee by a partisan vote."[11] The Secretary stated that he was respectfully declining to comply with the Committee's directive because section 204(e) and the Committee Resolution were unconstitutional under *Immigration and Naturalization Service v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In making that decision, the Secretary stated that he relied on opinions of the Attorney General and his own counsel.[12] Neither of these opinions referred to in the September 9 letter was apparently published or furnished to the House Committee. They have not been furnished to the Court. Moreover, the September 9 letter made no reference to the Department of Interior Regulation on emergency withdrawal. 43 C.F.R. § 2310.5. Nor is there reference to Congress' power to dispose of public lands under Article IV, Section 3, of the Constitution, as distinguished from Article I.

The September 9 letter further related that, out of respect for the Committee, the Secretary had requested the Bureau of Land Management to review the reasons stated by the Committee for its conclusion that an emergency existed justifying invocation of the authority vested in the Committee by section 204(e). Based on that review the Secretary concluded that "those reasons simply do not support the finding of an emergency which would justify withholding" the Fort Union lands from leasing. Letter at 1. There followed a detailed response to each of the reasons advanced by the Committee.

**III**

■ Before discussing the plaintiffs' chances of prevailing on the merits, it is necessary to address defendant's challenge to plaintiffs' standing to sue. This challenge was originally directed toward plaintiff organizations. The complexion of the standing issue changed significantly when Chairman Udall intervened. It is clear under the case law of this Circuit that a member of Congress has standing to protect the "effectiveness of his vote" in enacting a statute. *American Federation of Government Employees v. Pierce,* 697 F.2d 303, 305 (D.C.Cir.1982). In that case, a member of the House Appropriations Committee sued to halt a proposed executive action which, by statute, could not commence without the approval of his committee. He was held to have standing. The same principle applies here.

■ Once the standing of Chairman Udall is recognized, it is axiomatic that the other plaintiffs have standing. *See Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981). Moreover, the defendant's claim that plaintiff organizations lacked standing overlooked the preamble, text, and context of the 1976 Act, which forms the basis of this action. That statute stated Congress' purpose to be to protect the very values of scenery, wildlife and outdoor recreation that plaintiffs and their members now enjoy and claim that defendant threatens. In addition, the Resolution cited environmental as well as economic concerns as the basis for the request for withdrawal. *See infra* note 9. Given this expression of priorities by Congress and the Committee, plaintiff organizations could legitimately expect that a suit to enforce withdrawal

---

**10.** 48 Fed.Reg. 36,006 (Aug. 8, 1983) (notice of decision by Secretary to conduct on Sept. 14, 1983, a lease sale of 13 tracts in Fort Union region); 48 Fed.Reg. 37,529 (Aug. 18, 1983) (notice by Secretary that coal lease sale would be limited to 8 tracts representing 542.7 million tons of coal).

**11.** Letter from Secretary Watt to Chairman Udall at 1 (Sept. 9, 1983) (Attachment A to Defendant's Statement in Opposition to Motion for Preliminary Injunction).

**12.** At the Sept. 27 hearing, defendant's counsel stated the opinion attributed to the Attorney General in the Sept. 9 letter was actually the informal opinion of the Office of Legal Counsel of the Department of Justice and not a formal opinion of the Attorney General, as provided for by 28 U.S.C. § 512.

would, if successful, advance their environmental goals. Injury to aesthetic or environmental interests constitutes injury in fact for purposes of standing. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The causal connection between the threatened injuries which plaintiff organizations assert and the relief they request is sufficient to meet the standard set forth in those cases. Finally, it is noteworthy that the 1976 Act expressed Congress' desire that there be judicial review of defendant's actions affecting such values. *See supra* p. 1150.

## IV

On the merits, plaintiffs contend that issuance of the leases in the face of the House Committee's emergency withdrawal resolution violates section 204(e) of the 1976 Act and a parallel regulation, 43 C.F.R. § 2310.5, issued by the Department of Interior. Defendant counters that plaintiffs fail to state a claim upon which relief can be granted because section 204(e) and the regulation are "patently unconstitutional and unenforceable," citing *INS v. Chadha, supra.* Defendant's Statement in Opposition to Motion for Preliminary Injunction at 16.

Plaintiffs respond that the Committee Resolution is not a legislative veto, "but rather is an emergency legislative procedure" to withdraw the lands for leasing temporarily in order to enable Congress to study and, if necessary, change the defendant's coal leasing procedures. Plaintiffs' Memorandum in Support of Preliminary Injunction at 10. Plaintiffs rely upon Judge Jameson's recent decision in *Pacific Legal Foundation v. Watt,* 529 F.Supp. 982 (D.Mont.1982), sustaining another temporary withdrawal so long as the Secretary of Interior had the last word as to the duration of the withdrawal, and upon a footnote in *Chadha* that recognized the constitutionality of "report and wait" statutes. *INS v.*

*Chadha,* 103 S.Ct. at 2776 n. 9. Plaintiffs supplement their claim with the contention that a resolution passed pursuant to section 204(e) is not an exercise of legislative power subject to the restrictions of *Chadha,* but, instead, is an exercise of Congress' proprietary power over public lands. The latter power, they claim, is granted by Article IV and is not subject to the Article I requirements of bicameral passage and presentment.

Plaintiffs also urge that Department of Interior regulation 43 C.F.R. § 2310.5, by its terms, requires deference to the Resolution. Plaintiffs assert that the regulation is binding (even if the Resolution is not itself enforceable by direct operation of the statute) until defendant has amended or rescinded the regulation in the manner prescribed by the Administrative Procedure Act, 5 U.S.C. § 553. *See United States v. Nixon,* 418 U.S. 683, 694–96, 94 S.Ct. 3090, 3100–3102, 41 L.Ed.2d 1039 (1974); *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957). Plaintiffs urge that the Secretary's failure to rescind the regulation through notice and comment establishes the illegality of defendant's lease plan and makes consideration of his constitutional claim unnecessary.

Defendant has a number of responses. Defendant presses his constitutional claim based on the requirements in *Chadha* of bicameral passage and presidential presentment. He points to the standard announced by the Supreme Court for identifying an impermissible exercise of legislative power in these circumstances: whether the action altered the "legal rights, duties and relations of persons ... outside the legislative branch." *INS v. Chadha,* 103 S.Ct. at 2784. In *Chadha,* defendant points out, the House of Representatives overturned the Attorney General's decision not to deport Chadha. Here, defendant contends, the House Committee attempts to overturn defendant's decision to lease the coal lands at the time he had selected. It is defendant's position that the District Court's attempt in *Pacific Legal Foundation* to recast section 204(e) into something different from a leg-

islative veto did not survive *Chadha.* Even granting *Pacific*'s validity, *arguendo,* defendant contends that he complied with Judge Jameson's formula [13] and made an independent decision, contrary to the opinion stated by the House Committee, that there was no emergency and that therefore the withdrawal, if any, was ended.

Defendant also disputes plaintiffs' contention that Congress' Article IV power to dispose of public land is a plenary grant not subject to Article I restrictions. He cites *United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), for the contrary position. *See* Defendant's Supplemental Statement. Finally, defendant claims to be free of any obligation to follow his own regulation because it "is just as unconstitutional as FLPMA § 204(e)," citing *Texas Oil and Gas Corp. v. Watt,* 683 F.2d 427 (D.C.Cir.1982). Defendant's Statement in Opposition to Preliminary Injunction at 24.

## V

### A.

■ On the basis of the limited briefing and research which the schedule has afforded counsel and the Court, it appears to be unlikely that plaintiffs' original, nonconstitutional theory for distinguishing *Chadha* can succeed. If Congress' authority to enact the procedure at issue here derives solely from Article I of the Constitution, or if the *Chadha* rationale applies to Article IV, Section 3, the Committee resolution will probably be held to be impermissible legis-

lative activity. Plaintiffs' attempt to distinguish a section 204(e) withdrawal from a legislative veto on the grounds that the withdrawal is only temporary is unconvincing. A forced withdrawal, whether temporary or permanent, alters the legal rights and duties of the Secretary of the Interior, and this cannot be done, according to *Chadha,* without bicameral passage and presidential presentment. The holding in *Pacific Legal Foundation,*[14] which plaintiffs cite as support, seems susceptible to similar criticism. If section 204(e) is read to give the Secretary total discretion over the duration of the withdrawal, then the section would lose all force. Yet once the section is interpreted to mandate withdrawal for any length of time, it alters the Secretary's legal rights and duties.[15]

Finally, section 204(e) does not seem analogous, as plaintiffs claim, to the "report and wait" provisions that passed constitutional muster in *Chadha* and *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). The statute at issue in *Sibbach* provided that newly promulgated Federal Rules of Civil Procedure would not take effect for a certain period of time after presentment to Congress. This grace period, uniformly applied to every new rule, allows Congress time to amend or reject the rule if it desires. There is no similar rule of postponement universally applied to coal leases so that each lease can be reviewed by Congress as a whole. Rather, the House Committee may pick and choose to delay leases that may or may not become the subject of action by Congress. *Chadha* will probably be interpreted as holding that this

---

**13.** Judge Jameson indicated that the House Committee's power to withdraw, or to require the Secretary to withdraw, lands did not include the power to fix the minimum duration of the emergency and the withdrawal. *Pacific Legal Foundation v. Watt,* 529 F.Supp. at 1002.

**14.** *Pacific Legal Foundation* was decided after the Ninth Circuit had held the legislative veto unconstitutional in *Chadha* but before the Supreme Court rendered its decision. Although the Ninth Circuit and the Supreme Court reached the same conclusion, it is not clear that Judge Jameson's theory would hold up under the Supreme Court's reasoning.

**15.** Plaintiffs claim that section 204(e) must be read, at a minimum, to mandate withdrawal of land from leasing until the Secretary has filed a report as mandated by section 204(c)(2) detailing the withdrawal and current and proposed uses of the land, so that Congress can take informed action. Plaintiff is probably correct in asserting that the Secretary's letter of Sept. 9, 1983, describing his reasons for concluding that no emergency exists in the Fort Union region, does not provide the information required by section 204(c)(2). *See infra* p. 1158. Yet to require delay until a (c)(2) report is prepared would again be to alter the Secretary's legal rights, if any.

sort of selective review of executive action by less than the full Congress is not a permissible exercise of its legislative power under Article I.

### B.

■ Defendant's failure to follow his own regulation, or to rescind it after notice, comment, and reasoned determination, raises a more serious question. On the day after the Supreme Court decided *Chadha,* it announced its decision in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company,* —— U.S. ——, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). That decision reiterated the high standard set by Congress in the Administrative Procedure Act for Executive Department decisions which withdraw regulations, a standard not satisfied in that case even though there had been full compliance with APA notice and comment rules.[16] *A fortiori,* it will probably be held that defendant's decision not to follow his regulation, on the basis of informal, *ex parte,* unpublished legal opinions that the parallel provision of section 204(e) was void, violated those notice requirements. *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957); *see also United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).[17] Reliance on such *ex parte* opinions without minimal testing by other interested persons does not satisfy the notice and comment requirements of APA. *See, e.g., Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 716 F.2d 915 at 920 (D.C.Cir.1983); *National Association of Home Health Agencies v. Schweiker,* 690 F.2d 932, 948–50 (D.C.Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983); *Dis-*

*trict of Columbia Hospital v. Heckler,* No. 82–2520 (D.D.C. April 29, 1983).

Neither the material furnished by the parties nor that otherwise available to the Court in this brief time establishes with the certainty perceived by the defendant's legal advisers that section 204(e) of the 1976 Act, the Committee resolution, and the regulation are, as defendant asserts, "patently unconstitutional." At issue in *Chadha* was the congressional power "[t]o establish a uniform Rule of Naturalization" under Article I, Section 8, of the U.S. Constitution. Article IV, Section 3, by contrast, provides that:

> The Congress shall have Power to *dispose of and* make all needful Rules and Regulations respecting the Territories or other Property belonging to the United States .... (Emphasis added.)

In interpreting Article IV, the Supreme Court has stated that:

> Congress not only has a legislative power over the public domain, but it also exercises the powers of the proprietor therein.... Like any other owner it may provide when, how and to whom its land can be sold.

*United States v. Midwest Oil Co.,* 236 U.S. 459, 474, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915); *see also Kleppe v. New Mexico,* 426 U.S. 529, 536–43, 96 S.Ct. 2285, 2290–2293, 49 L.Ed.2d 34 (1976).

It may well be that when this Court, the Court of Appeals, or the Supreme Court has had comprehensive briefs and an adequate opportunity to consider all the relevant historical evidence [18] about the drafting and context of Article IV, Section 3, as well as its application over the years, they will reach a conclusion contrary to the opinions relied upon by the defendant here. The

---

**16.** *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 103 S.Ct. at 2864.

**17.** There is no evidence that the opinions relied upon by defendant even address the constitutionality of the regulation.

**18.** The Supreme Court frequently gives great weight to historical evidence when it is called upon to decide original questions of constitutional law. *See, e.g., Marsh v. Chambers,* ——

U.S. ——, 103 S.Ct. 3330, 3332–34, 77 L.Ed.2d 1019 (1983) (chaplains for legislatures); *Solem v. Helm,* —— U.S. ——, 103 S.Ct. 3001, 3006–07, 77 L.Ed.2d 637 (1983) (proportionality of punishment); *INS v. Chadha,* 103 S.Ct. at 2781–84 (legislative veto); *Powell v. McCormack,* 395 U.S. 486, 522–48, 89 S.Ct. 1944, 1964–78, 23 L.Ed.2d 491 (1969) (exclusion of member-elect from House).

Supreme Court has stated that Congress' proprietary interest in public lands gives it constitutional prerogatives which transcend those which it enjoys in its purely legislative role in respect of immigration. *See, e.g., United States v. California*, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889 (1947). Moreover, it is common historical knowledge that in the years before the Constitution was adopted (and for many years thereafter) Congress was in session for only brief periods and in recess for many months at a time. Public lands were matters of even greater public and political interest than they are now. It is not inconceivable that courts will decide from the text and context of Article IV, Section 3, that its Framers contemplated that Congress' proprietary power to "dispose of" public lands included the power to delegate power to dispose of public land to the Executive as a trustee. The Framers may well have contemplated that such an Article IV delegation might be subject to an express and narrow condition that a specified Committee of Congress could, during or in anticipation of a congressional recess, temporarily suspend that delegation in the manner now provided for in section 204(e) of the 1976 Act. Such a condition would be analogous to limitations traditionally imposed by settlors under familiar principles of trust law.

Dictum in *United States v. California*, 332 U.S. 19, 28, 67 S.Ct. 1658, 1663, 91 L.Ed. 1889 (1947), relied upon by defendant, does not hold to the contrary, and other statements in that opinion may prove fatal to his defense. That original action involved the question of whether California or the United States "owns, or has paramount rights in and power over several thousand square miles of land under the ocean off the coast of California." *Id.* at 24–25, 67 S.Ct. at 1661. Defendant relied upon the element of the *California* decision that honored the authority of the Attorney General to file that original action in the Supreme Court despite a resolution by both Houses of Congress which, if signed by the President, would have ceded the tidelands in question

to California. The Court decided that since the President had vetoed the cession, it had not precluded the Attorney General from prosecuting that original action. The Court indicated thereby that only a formal legislative Act of Congress pursuant to Article IV could divest the Attorney General of his authority to sue. But another nearby statement in the *California* opinion[19] went on note with respect to Congress' Article IV power:

> We have said that the constitutional power of Congress in this respect is without limitation .... Thus neither the courts nor the executive agencies could proceed contrary to an Act of Congress in this congressional area of national power.

*Id.* at 27, 67 S.Ct. at 1663.

Applying that statement to the present case, it is noteworthy that Congress enacted section 204(e) and a President signed it. It is an Act of Congress "in this congressional area of national power." One provision requires the Secretary to withhold leasing temporarily at the request of the House Committee. The *California* opinion may well presage a decision that neither the defendant nor the courts may "proceed contrary" to that statute.

■ All of these considerations give substance to what may at first blush appear to be a hypertechnical claim by plaintiffs: that defendant violated the APA when he treated as void a Department regulation in reliance on informal *ex parte* legal opinions, without notice and comment. Notice and comment would have afforded scholars and interested parties, including possibly counsel for the House of Representatives, the courtesy and the opportunity to do some of the research and analysis requisite to a reasoned decision about an original constitutional question and test the opinions of defendant's advisors. As our Court of Appeals has recently stated in a related context with respect to the APA requirement of notice and comment before a regulation is rescinded or disregarded:

**19.** *Compare* Defendant's Supplemental Statement at 3 (quoting from *U.S. v. California*).

This requirement permits interested parties to criticize the proposed agency action, and allows the agency to benefit from outside suggestions. *See National Tour Brokers Association v. United States,* 591 F.2d 896, 902 (D.C.Cir.1978). *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 716 F.2d 915 at 920 (D.C.Cir.1983). All of the reasons why a department head's rule-making decisions must be the product of "reasoned decision making" after notice and comment should apply as much to a delicate and original question of constitutional law as to matters of fact and policy. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 103 S.Ct. at 2871.

### C.

This is not a case where Congress repealed a statute leaving an implementing regulation high and dry. *See Texas Oil and Gas Corp. v. Watt,* 683 F.2d 427 (D.C.Cir. 1982). Obviously, notice and comment would not enhance the simple process of discerning that Congress has repealed a statute. But, by contrast, the original constitutional question of whether *Chadha* applies to conditions attached by Congress to a delegation of its power to dispose of or withhold public land pursuant to Article IV, Section 3, is complex and delicate. Defendant's reliance on *Texas Oil* to justify his disregard of his own regulation is misplaced.

### D.

■ Finally, it is probable that other language in section 204, the constitutionality of which is unchallenged, will provide an independent basis for the regulation's vitality. That statutory language gives the Secretary discretionary authority on his own to declare an emergency and withdraw land from leasing. The challenged regulation could be viewed as a binding commitment by the Secretary to exercise this discretionary authority to declare such an emergency and to effect such a temporary withholding

in deference to the formally expressed concerns of a previously designated Committee of Congress. Thus, the APA obligated the Secretary to follow his own regulation until he had published notice of his intention to rescind it, invited comment, put that comment (including the constitutional law opinion of the Department of Justice) on the public record, and published a reasoned and reviewable explanation of his decision to rescind.

Defendant claims that even if section 204(e) and the regulation remain valid, the September 9 letter is the functional equivalent of the report required of him by section 204(e), as more fully described in section 204(c)(2). However, the Court has compared the September 9, 1983, letter with an Interior Department report[20] on an emergency withdrawal of land forwarded to the House Committee on September 10, 1981, with respect to what appears to be proposed leasing of other Montana lands at issue in *Pacific Legal Foundation v. Watt,* 529 F.Supp. 982 (D.Mont.1982). The comparison dramatizes the apparent failure of the September 9 letter to comply with the requirements of section 204(c)(2).

### E.

On the basis of the foregoing, the Court is persuaded that plaintiffs will probably prevail on the merits of their claim that defendant violated the Department of Interior regulation which required the defendant to withhold land when the House Committee served notice of an emergency. A court will probably conclude that, until legally revoked, the regulation is effective irrespective of the validity of section 204(e). Even if 204(e) were found unconstitutional, notice and comment would provide the Secretary with the opportunity to evaluate the regulation in light of comity concerns. *See, e.g., INS v. Chadha,* 103 S.Ct. at 2796 n. 11 (White, J., dissenting).

### VI

Finally, it is necessary to address the related questions of whether plaintiffs are

---

**20.** *See* U.S. Dept. of Interior, Report on the Emergency Withdrawal of Land in the Bob Marshall, Scapegoat, and Great Bear Wilderness Areas, Montana (Sept. 14, 1981).

threatened with irreparable injury, whether granting of relief will seriously harm defendant, and, finally, what would best serve the public interest. Considering these factors in reverse order, the evidence about the public interest demonstrates that it would be best served by maintaining the *status quo,* at least until there can be adequate consideration of the serious constitutional problem underlying this controversy. The Congress' view of the public interest has been expressed not only by the Act and the House Committee Resolution, but also by the passage by each House of a bill declaring a moratorium on these and other coal leases and by a law, passed by Congress and signed by the President, for the appointment of a Commission to re-examine the defendant's coal leasing procedures. *See supra* p. 1152. There is also a public interest in diplomatic resolution of constitutional impasses between the Congress and the Executive. Yet if unrestrained, defendant could alter rights or permit damage to the land in a way that confronted the courts with a *fait accompli* before they could resolve the impasse.

Plaintiff Udall's claim of irreparable injury is obvious. Because of the Secretary's disregard of the withdrawal mechanism of section 204(e), unless he is restrained, Congress would not be able to act under the same circumstances as when the House Committee passed its resolution, and in fact might not have an opportunity to act at all. *See American Federation of Government Employees v. Pierce,* 697 F.2d at 305. The other plaintiffs have a similar interest which would also suffer irreparable injury.

Defendant may also be harmed by the issuance of a preliminary injunction. Legislation has passed both Houses of Congress that would bar the sale of coal leases in the fiscal year 1984. Therefore, if the leases in question are not issued by September 30, 1983, they may not be issued at all. The Court must balance this concern against the others. Considerations about the public interest and threatened harm to plaintiffs outweigh any harm which defendant is likely to suffer from maintenance of the *status quo* pending a decision. All things considered, plaintiffs' motion for a preliminary injunction should be and has been granted.