STATE OF NEW MEXICO, ex rel., Tom UDALL, Attorney General, Plaintiff,

Natural Resources Defense Council, et al., and State of Texas, ex rel., Dan MO-RALES, Attorney General, Plaintiffs–Intervenors,

v.

James D. WATKINS, Secretary of the Department of Energy, et al., Defendants.

ENVIRONMENTAL DEFENSE FUND, et al., Plaintiffs,

v.

James D. WATKINS, Secretary of the Department of Energy, et al., Defendants.

Civ. A. Nos. 91–2527, 91–2929.

United States District Court, District of Columbia.

Dec. 13, 1991.

Beknhardt Wruble, Washington, D.C., for plaintiffs.

Michael Reed, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

This case is presently before the Court on a motion for preliminary injunction by plaintiff, State of New Mexico ("New Mexico") and plaintiff-intervenors, Natural Resources Defense Council, et al. ("NRDC"), and plaintiff-intervenor, State of Texas ("Texas"). Plaintiff and plaintiff-intervenors seek a preliminary injunction to enjoin the Department of Energy ("DOE") from introducing radioactive waste to the Waste Isolation Pilot Plant site, a proposed nuclear waste repository located in New Mexico and operated by the DOE.

On October 9, 1991, New Mexico filed this action and a motion for temporary restraining order. At that time, the parties

entered into a stipulation to maintain the status quo until at least November 8, 1991. The motion for temporary restraining order was then converted into a motion for preliminary injunction. On November 15, 1991, the Court heard oral arguments on the motion for preliminary injunction. At that time, the parties represented that under a consultation agreement, New Mexico would be entitled to seven days notice before the DOE proceeds with its proposed action. Transcript of Hearing on Motions for Preliminary Injunction and Summary Judgment, ("Transcript"), pp. 27–28, 37–38.

Upon careful consideration of the motions, the opposition thereto, and the entire record in this case, the Court concludes that a preliminary injunction is necessary.

## I.

At the center of the controversy is a project entitled the Waste Isolation Pilot Program, ("WIPP"). The government has been exploring solutions to the national problem of nuclear waste disposal since the mid 1950's. Defendants' Opposition to Preliminary Injunction, p. 1. The WIPP has been described as the "result of a long and thorough search for a research facility in which to examine and demonstrate the safe, long-term management of DOE defense-generated radioactive waste." *Id.* The WIPP site is located in 200 million year old salt beds, 26 miles southeast of Carlsbad, New Mexico. *Id.* The site was chosen because the geological medium of bedded salt is desirable for radioactive waste disposal. *Id.* The WIPP is located on 10,240 acres of the public lands of the United States. Plaintiff's Motion for Preliminary Injunction, p. 3.

In 1979, Congress enacted Public Law 96–164 section 213 which authorized WIPP as a site for "providing a research and development facility to demonstrate the safe disposal of radioactive wastes resulting from federal defense activities and programs." Defendants' Opposition to Preliminary Injunction, p. 2, Pub.L. No. 96–164, section 213, 93 Stat. 1259, 1265–66 (1979).

In 1982, the Secretary of the Interior, granted the first withdrawal of the WIPP site, pursuant to his authority under the Federal Land Policy and Management Act, 43 U.S.C. section 1714(a). Specifically, Public Land Order No. 6232 withdrew 10,200 acres of the WIPP site solely for research and development purposes pending a legislative withdrawal.[1]

In 1983, the DOE sought a new withdrawal of the WIPP site in order to begin the construction phase. Plaintiff's Motion for Preliminary Injunction, p. 11. Subsequently, Public Land Order 6403 was issued. This Order withdrew the requested acreage for the construction of the WIPP site. *Id.*, p. 11, 48 Fed.Reg. 31,038 at 3878. The Public Land Order further specified that the withdrawal would not authorize transportation, storage or burial of any radioactive materials.[2] *Id.* p. 12.

In 1989, the DOE sought to "modify and extend" existing Public Land Order 6403. The DOE's application specifically sought to change the purpose of the previous withdrawal to allow a test program by the DOE which would introduce "retrievable radioactive waste" at the site, in contravention of the purpose expressed in the previous land

---

**1.** The Order provides in relevant part:

By virtue of the authority vested in the Secretary of the Interior by Section 204 of the Federal Land Policy and Management Act of 1976 ... it is ordered as follows:
1. Subject to valid existing rights, the following described public lands which are under the jurisdiction of the Secretary of the Interior are hereby withdrawn from settlement, sale, location or entry, under all of the general land laws, including the mining laws, 30 U.S.C. Chapter 2, for the purpose of performing a Site and Preliminary Design Validation Program (SPDV) in connection with a Waste

Isolation Pilot Plant Project of the Department of Energy and to protect the lands pending a legislative withdrawal if appropriate.
47 Fed.Reg. 13340.

**2.** The Public Land Order provided that the withdrawal:

"does not authorize the use or occupancy of the lands hereby withdrawn for the transportation, storage or burial of any radioactive materials, except as to radiological instruments normally used for nondestructive testing and geophysical logging."
48 Fed.Reg. 31038–39.

order. Plaintiff's Motion, p. 12; 54 Fed. Reg. 15815. The application was granted on January 22, 1991 by Public Land Order No. 6826 which modified and extended the previous land order to "expand the stated purpose ... to include conducting the Test Phase of the project using retrievable transuranic radioactive nuclear waste at the site...." *Id.* 56 Fed.Reg. 3038.

Plaintiff brings this action to enjoin the DOE from proceeding with this test phase of the WIPP project without a legislative withdrawal of such lands for the permanent disposal of radioactive wastes.

## II.

Injunctive relief is appropriate where the plaintiff shows (1) that it has a strong likelihood of success on the merits, (2) that it will suffer irreparable injury if injunctive relief is denied, (3) that other interested parties will not suffer substantial harm if injunctive relief is granted, and (4) that the public interest favors the granting of injunctive relief, or at least, that the granting of injunctive relief is not adverse to the public interest. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S.App.D.C. 220, 222, 559 F.2d 841, 843 (1977). In addition, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *Id.*

Likelihood of Success on the Merits

█ Plaintiff and plaintiff-intervenors argue that they are likely to succeed on the merits of this case because the DOI's 1991 land withdrawal violates the Federal Land Policy and Management Act ("FLPMA"). New Mexico's and plaintiff-intervenors' core arguments on this prong of the preliminary injunction test may be summarized as follows: (1) the Secretary of the Interior cannot accomplish a withdrawal of WIPP lands for an entirely new purpose through the withdrawal extension procedure under FLPMA, (2) FLPMA was violated when the Secretary of the Interior effectively permanently withdrew federal lands since he is only authorized to make temporary withdrawals. Plaintiff's Motion for Preliminary Injunction, p. 9; Plaintiff–Inter-

venor's Motion for Preliminary Injunction, p. 3.

Defendants argue that plaintiffs have failed to show a likelihood of success on the merits because the Secretary of the Interior's withdrawal was authorized under FLPMA. Defendants' Opposition to Preliminary Injunction, p. 21. Secondly, defendants argue that no *de facto* permanent withdrawal has occurred because the Secretary of Energy "intends to complete [the test phase] within the withdrawal period, and have enough time left over to initiate retrieval of test wastes if a decision is made not to use WIPP as a permanent disposal site." *Id.* Inherent in defendants' argument is that neither the Department of Energy nor the Department of Interior has the constitutional authority to withdraw the WIPP site as a permanent disposal site.

Under Article IV, Section 3, of the Constitution, "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...." The Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 et seq. is a specific regulation respecting property belonging to the United States. Further, FLPMA specifies that Congress shall "exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress [shall] delineate the extent to which the Executive may withdraw lands without legislative action." 43 U.S.C. section 1701(a)(1).

In the present action, Congress has not yet permanently withdrawn the WIPP site for disposal and storage of defense generated nuclear waste. In fact, at the very same time that the DOI administratively extended the terms of a previous withdrawal of WIPP to include a new purpose, Congress is in the process of determining whether a permanent withdrawal for such purpose is appropriate. Congress has appropriated funds to excavate and equip the WIPP, but it has not yet authorized the introduction of radioactive waste there. Plaintiff's Motion for Preliminary Injunction, p. 3. On June 13, 1991, a bill was introduced in the House of Representatives to withdraw lands for the Waste Isolation

Pilot Plant and for other purposes. H.R. 2637, 102nd Cong., 1st Sess. (1991). The proposed legislation provides that the Secretary may not transport any transuranic radioactive waste to WIPP to conduct test phase activities until certain requirements, including compliance with Environmental Protection Agency ("EPA") standards, have been met. *Id.* A similar bill was introduced in the Senate. S. 1671, 102nd Cong., 1st Sess. (1991). However, the proposed legislation has not been enacted as of this date.

Notwithstanding Congressional consideration of withdrawal of the WIPP site, defendants argue that the Secretary of the Interior's action was proper because he merely extended a previous land withdrawal which is within his authority under FLPMA. While defendants argue that the Secretary of the Interior's action was proper, they concede that it would have been preferable for Congress to address the issue of a legislative withdrawal.[3]

With regard to the Secretary of the Interior's power to extend a previous land withdrawal, section 1714(f) of FLPMA provides:

All withdrawals and extensions thereof, whether made prior to or after October 21, 1976, having a specific period shall be reviewed by the Secretary [of the Interior] toward the end of the withdrawal period and may be extended or further extended only ... if the Secretary determines that the purpose for which the withdrawal was first made requires the extension, and then only for a period no longer than the length of the original withdrawal period. The Secretary shall report on such review and extensions to the Committees on Interior and Insular Affairs of the House of Representatives and the Senate.

43 U.S.C. section 1714(f).

■ Thus, the term of a withdrawal of public lands may be extended only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension. In the present action, it appears that no such determination could have been made. In this regard, it is useful to reiterate the purposes of the previous withdrawals. The first withdrawal, Public Land Order 6232, withdrew WIPP lands to perform site and design evaluations in connection with a Waste Isolation Pilot Plant project and to protect the lands pending a legislative withdrawal. *See* Section I. *supra.* The second withdrawal, Public Land Order 6403, which is the subject of the DOI's current extension and modification, withdrew the lands at issue to construct the WIPP site, and protect the lands, pending a legislative withdrawal. *Id.* More importantly though, the second withdrawal specified that transportation, storage, or burial of any radioactive materials was not authorized. Notwithstanding the stated purpose of the second withdrawal, the DOE applied for an extension of the second withdrawal and proposed to transport and store nuclear wastes at the WIPP site for a test phase. This extension materially altered the purpose of the second withdrawal. Further, instead of applying for a third withdrawal as had been done in the past when the WIPP site was sought to be withdrawn for a new purpose, the DOE applied for an extension of the 1983 withdrawal, together with a modification to change the purpose of the land withdrawal.

■ Defendants argue that FLPMA was not violated because it was within the Secretary of the Interior's authority to extend and modify the previous 1983 withdrawal. Defendants' Opposition to Motion for Preliminary Injunction, p. 22. Defendants correctly state that FLPMA authorizes the Secretary of the Interior to extend and modify existing land withdrawals. Section 1714(a) of FLPMA specifically authorizes

---

**3.** *See* Transcript, pp. 47–48:

The Court: ... [It] would have been preferable if Congress ... had addressed [a legislative withdrawal of the WIPP site].

Ms. Zanders: It would have been preferable, but ... we are authorized under FLPMA to go ahead.

The Court: Isn't that one of the questions?

Ms. Zanders: That is one of the questions....

The Court: But if it is preferable for Congress to address the issue, why not hold this matter in abeyance and allow them to address it?

Ms. Zanders: Because we've been waiting now for four years and there doesn't seem to be a resolution in the near future.

the Secretary of the Interior to "make, modify and extend or revoke withdrawals." However, that section also emphasizes that the Secretary of the Interior may only modify, extend or revoke existing land withdrawals "in accordance with the provisions and limitations of this section." Reading FLPMA section 1714(a) with section 1714(f) it is apparent that the Secretary of the Interior does not have complete discretion in making an extension, but may do so only if he finds that such extension is necessitated by the purpose of the original withdrawal. Here, the Secretary of the Interior could not have made such a determination because the purpose of the original withdrawal and the purpose of the purported extension/modification, as discussed above, directly contradict each other.

Additionally, under FLPMA the Secretary of the Interior may authorize only the temporary withdrawal of public lands. 43 U.S.C. section 1714(c)(1). As stated above, Congress has reserved the authority to make any permanent land withdrawals. Plaintiff and plaintiff-intervenors argue that the extension and modification of the previous land withdrawal is effectively a permanent withdrawal exceeding the scope of the Secretary of Interior's authority under FLPMA. Plaintiff–Intervenors' Motion for Preliminary Injunction, p. 11. They assert that the WIPP's geological qualities, i.e. location in salt beds, renders it an inherent permanent storage repository. Plaintiff's Motion for Preliminary Injunction, p. 15. Further, the record indicates that the salt structures of the WIPP "are in constant flux, and are expected to collapse around, crush and embed the deposited waste." *Id.* Defendants do not contest that the WIPP site has all of the characteristics for a permanent waste repository. In fact, they maintain that that is the reason the WIPP site was chosen in the first place. Defendants' Opposition to Preliminary Injunction, p. 33. However, defendants urge that because the waste can be retrieved within the test phase period and the period

of the current withdrawal, any storage of nuclear waste would be a "temporary use" and thus would not violate FLPMA.

Defendants have presented no convincing evidence that the hazardous waste materials they seek to introduce in the WIPP site can be retrieved. Defendants argue that it is the very nature of the salt beds which would effectively provide them with a six month warning mechanism which in turn would allow them to retrieve the waste if need be. Specifically, defendants contend that "enhanced geotechnical monitoring systems will provide at least six months of advanced warning of a potential roof fall, enabling the safe retrieval of waste." Defendants' Opposition to Preliminary Injunction; Administrative Record, IV.JJ, page 4–3; IV.00.

The record, however, shows that there is a great likelihood that the wastes proposed to be emplaced in WIPP will not be retrievable after the test phase. It appears that "the physical security of any underground room within the WIPP cannot be guaranteed." Plaintiff's Motion for Preliminary Injunction, Chaturvedi Affidavit, ¶ 13. Additionally, there is evidence that waste received for tests cannot be expected to be retrievable after eighteen months and that the DOE's proposed roof support system is defective. Fernandez Affidavit. Further, the record reflects that WIPP has very recently experienced roof collapses which were in fact unanticipated by DOE.[4]

Defendants contend that an expert panel considered a modified roof support system, which would allow for a warning of impending roof cave-ins. Administrative Record, IV.JJ, p. 4–1; IV.F. However, as demonstrated by the above, the panel did not conclude with sufficient definiteness that the system would prevent collapse of the rooms during the term of the test phase.

For the above reasons, the Court concludes that plaintiff and plaintiff-intervenors have met their burden on likelihood of success on the merits.

---

4. On October 20, 1991 the WIPP suffered a collapse in which seventy tons of rock fell in a proposed test room. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, p. 10; DOE Press Release, October 22, 1991. Further, DOE had only been able to anticipate this collapse over the past month. *Id.*

Irreparable Injury

Plaintiff and plaintiff-intervenors have additionally shown that they will be irreparably injured if a preliminary injunction is not issued. If a preliminary injunction is not issued and the DOE is allowed to proceed with its test phase, "the DOE will be able to introduce radioactive waste which may become unretrievable by reason of collapse of the underground facility, impending collapse, or loss of required clearance, before a final order can issue." Plaintiff's Motion for Preliminary Injunction; Parker Affidavit ¶¶ 31, 44–45, 47; Fernandez Affidavit ¶¶ 9, 21, 22. This further constitutes irreparable injury because Congress would not be able to act under the same circumstances as when the WIPP site was under a previous withdrawal which expressly stated that no hazardous waste could be stored at the site until Congress makes a determination to permanently withdraw the site for such purpose. *See National Wildlife Federation v. Watt*, 571 F.Supp. 1145, 1159 (D.D.C.1983).

Interests of Third Parties/Public Interest

Finally, plaintiff and plaintiff-intervenors have also shown that interests of third parties will not be harmed; and that it is in the strong interest of the public to issue an injunction.

Defendants argue that the DOE will be harmed by the entering of a preliminary injunction. Defendants also argue that an injunction is against the public's interest. Specifically, defendants state that to date over one billion dollars have been spent on the WIPP project and an additional thirteen million dollars will be expended monthly in order to maintain the WIPP site. Transcript, pp. 46–47. Defendant's argument does not convince the Court because it is uncontested that the same amount of money will be expended on the WIPP project regardless of whether the test phase goes forward. Moreover, as the court stated in a similar case involving the Secretary of the Interior's proposed action under FLPMA, there is a strong "public interest in diplomatic resolution of constitutional impasses between the Congress and the Executive." *National Wildlife Federation v. Watt*, 571 F.Supp. 1145, 1159 (D.D.C.1983). The court in *Watt* empha-

sized that "if unrestrained, [the Secretary of the Interior] could alter rights or permit damage to the land in a way that confronted the courts with a *fait accompli* before they could resolve the impasse." *Id.* Here there is a similar public interest in ensuring that Congress is able to exercise its constitutional power to permanently withdraw public lands, without being confronted with a situation where the Secretary of the Interior has effectively precluded it from so doing.

### III.

For all of the foregoing reasons, the Court finds that plaintiff's and plaintiff-intervenors motion for a preliminary injunction should be granted. Under the facts of this case, the Court will not require the plaintiff to post a bond. An appropriate order has been filed.