**CITY OF ALEXANDRIA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 560–82L.**

United States Claims Court.

Oct. 20, 1983.

As Corrected Nov. 2, 1983.

On Motion For Rehearing Dec. 1, 1931.

Kenneth L. Adams, Washington, D.C., for plaintiff. Judith E. Schaeffer, Dickstein, Shapiro & Morin, Washington, D.C., and Cyril D. Calley, City of Alexandria, Alexandria, Va., of counsel.

Lynn Rubinstein, Washington, D.C., with whom was Acting Asst. Atty. Gen. F. Henry Habicht, III, Washington, D.C., for defendant. Terry Hart Lee, General Services Administration, and Pauline H. Milius, Dept. of Justice, Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

In this breach of contract action, plaintiff, the City of Alexandria ("plaintiff" or the "City"), seeks the difference between the price it paid for a parcel of surplus government real property and a lesser price allegedly agreed upon under a prior contract of sale for the same parcel. Although arguing that this claim is not appropriate for summary disposition due to contested issues of material fact, the City takes the

position that if the case proceeds on summary judgment the Government should be estopped from denying the existence of the earlier contract or of an intervening contract, also for a lesser price than the City finally paid. As a final alternative, the City seeks interest on an earnest money deposit given for the first contract.

This case is now before the court after argument on defendant's motion for summary judgment on the issue of the existence of an express contract, as opposed by plaintiff, and on plaintiff's motion for summary judgment on the issue of estoppel, as opposed by defendant. Defendant cross-moved on this issue in oral argument. Plaintiff also moved orally, over opposition, for summary judgment based on a contract implied in fact.

## FACTS

In its opposition to defendant's motion for summary judgment, the City identified twelve issues of allegedly disputed facts which precluded summary judgment. Although, as defendant argues, most of these issues are either conceded or immaterial, the following recitation considers all salient facts in the light most favorable to the City, the non-moving party, and resolves all doubts against the Government, as the movant. *See Lehner v. United States,* 1 Cl.Ct. 408, 412 (1983) (NETTESHEIM, J.) (citing cases).

*The Invitation To Offer at $925,000*

On November 8, 1977, the General Services Administration ("GSA") determined the King's Warehouse site ("the lot") in Old Town Alexandria, Virginia, to be surplus government property. Section 203(a) of the Federal Property and Administrative Services Act of 1949, 63 Stat. 385 (1949) (codified as amended at 40 U.S.C. § 484(a) (1976)), empowers the Administrator of GSA to supervise and direct sales of such property. The Administrator's authority to dispose of surplus real property has been delegated to the Federal Property Resources Service (the "FPRS"), part of GSA's central office, which, in turn, has delegated its authority to the regional administrators.

After an unsuccessful attempt to acquire the lot by a historic preservation grant, the City informed GSA, on November 17, 1978, of its desire to purchase the lot by negotiated sale pursuant to 40 U.S.C. § 484(e)(3)(H).[1] Carlton Brooks ("Brooks"), Director, Real Property Division of the FPRS, replied on November 30 informing plaintiff that "negotiated sales of surplus Federal real property are based on the property's market value and subject to Congressional review. We are proceeding to obtain the necessary clearances within GSA and will send the City an offer as soon as possible."

The clearances included both the GSA Administrator's and the FPRS's approval of the National Capital Region's (the "Regional Office") disposal plan for the lot. On May 16, 1979, the FPRS authorized the Regional Office to negotiate a sale of the lot to the City at not less than the lot's appraised value of $790,000. If such a price could be negotiated, an explanatory statement was to be prepared for the Administrator of GSA to submit to the Senate Committee on Governmental Affairs and the House Committee on Government Operations (the congressional oversight committees), as required by 40 U.S.C. § 484(e)(6).[2] According to plaintiff, these advance clearances prove that if the contract subsequently negotiated had been submitted to the FPRS for review, it would have been approved.

On June 22, 1979, Regional Administrator Walter V. Kallaur ("Kallaur") sent the City an invitation to offer, pursuant to 41 C.F.R. § 101–47.304–4 (1978), on a form styled "Offer For Purchase" ("OFP"). The OFP identified the City as the "offeror" in the transaction and recited both that the offer-

or offered to purchase the lot for $925,000 cash and that the "Offer for Purchase of Government Property" was subject to the "General Terms Applicable to Negotiated Sales" in the attached GSA Form 2041 and to special terms set forth in the OFP. Form 2041 contained a "Rescission" clause, which provided in part:

> b. An explanatory statement . . . will be submitted to the appropriate committees of the Congress . . . and the offer probably will not be accepted by the Government until after the proposed disposal has been considered by such committees. . . .
>
> c. Any recission, [sic] pursuant to a or b, above, will be without liability on the part of the Government other than to return the earnest money deposit without interest.

In his June 22, 1979 cover letter, Regional Administrator Kallaur requested that the City "review the Offer and, if it is acceptable to you, return two executed copies together with the necessary resolutions and a 10 per cent earnest money deposit." The City has characterized the cover letter and the OFP as an offer by GSA to sell the lot to plaintiff.

### Negotiation of the Sale

On August 6, 1979, a meeting took place between Kallaur and Brooks and city officials. At this meeting Kallaur agreed to give plaintiff sufficient time to respond to the OFP so that it could gain the City Council's approval at the next council meeting on September 11. The City expressed a desire to file another application to acquire the lot free under a historic preservation grant. Kallaur agreed by letter dated August 7, 1979, that if the application were

---

1. Section 484(e)(3) provides in pertinent part:
 Disposals and contracts for disposal may be negotiated . . . [without public advertising for bids] . . . if
 &ast; &ast; &ast; &ast; &ast; &ast;
 (H) the disposal will be to States, Territories, possessions, political subdivisions thereof, or tax-supported agencies therein, and the estimated fair market value of the property and other satisfactory terms of disposal are obtained by negotiation . . . .

2. Section 484(e)(6) provides in pertinent part:
 [A]n explanatory statement of the circumstances of each disposal by negotiation of any real or personal property having a fair market value in excess of $1,000 shall be prepared. Each such statement shall be transmitted to the appropriate committees of the Congress in advance of such disposal. . . .

successful "or if the City wishes to withdraw its offer before December 31, 1979, we will allow the withdrawal. Otherwise, I will proceed with the sale of the property to the City." Kallaur stated in deposition that he did not mean that he would wait until December 31 to process the offer. "We would process it any time prior to that date whenever they submitted it, if that is what they indicated to us that that is what they wanted to do."

GSA's Handbook for Disposal of Surplus Property, which contains instructions and procedures for the disposal of surplus real property, provides in part:

> If at the time of the submission of the explanatory statement to the committees the appraisal of the property would be more than nine months old, the regional office shall have that appraisal updated
> ....

PBS P. 4000.1–113e (Apr. 19, 1977). This handbook was not in the public domain. The appraisal on which the $925,000 price was based was due to expire on December 16, 1979, under this guideline. At the meeting on August 6, 1979, city officials were not told that the offer at $925,000 no longer would be viable if the explanatory statement had not been submitted to Congress by December 16. The GSA officials, however, did advise city officials that the current appraisal would expire in December and the price might then go up, but that if plaintiff submitted the OFP before the deadline the property would be sold to the City for $925,000. The GSA officials stated that the sale was subject to congressional review, although this was a routine formality.

At the conclusion of the August 6 meeting, Kallaur said that he had been pleased to make a deal (a statement defendant terms unauthorized), and both sides left with the understanding that a deal had been made subject only to the City's compliance with GSA's formalities. A city official requested confirmation by letter that if the City Council approved the purchase the property would be sold for $925,000. Kallaur supplied the requested letter on August 7. Defendant disputes plaintiff's statement that the letter was reviewed by the FPRS without negative comment, but states that this is immaterial, because the Regional Office's disposal plan had been approved. The City contends that Kallaur's August 7 letter and representations at the August 6 meeting provide one basis to estop the Government from denying a contract at $925,000.[3]

On September 11, 1979, the City Council passed a resolution "That the ... [OFP] ... *whereby the City offers* to purchase ... [the lot] ... is hereby approved ...." and "That Mr. Douglas Harman ... is hereby authorized to execute said *Offer* on behalf of the City ...." (Emphasis added). On October 9, 1979, the City delivered to GSA Real Property Division Director Brooks the signed OFP, the earnest money deposit of $92,500, and a copy of the City Council's resolution, together with a cover letter from City Manager Douglas Harman requesting credit terms. City official Edward C. Garrity ("Garrity") told Brooks, however, that the City would buy the property regardless of whether credit were extended and that plaintiff had decided not to reapply for a historic preservation grant. Brooks assured Harman that the lot now would be conveyed to plaintiff for $925,000 since the City had done everything it was supposed to do (the authorization to give such an assurance presenting a legal question, according to defendant). The acceptance page of the OFP is unsigned,[4] although GSA cashed plaintiff's check for $92,500.

---

3. The City's motion is treated as so arguing.

4. This section of the OFP reads in full:
 ACCEPTANCE BY THE GOVERNMENT
 The foregoing "Offer for Purchase of Government Property" is hereby ACCEPTED by and on behalf of the UNITED STATES OF AMERICA this ____ day of _____, 19__.
 UNITED STATES OF AMERICA

 Acting by and through the
 ADMINISTRATOR OF GENERAL SERVICES
 By
 D. CARLTON BROOKS
 Director, Real Property Division
 Federal Property Resources Service

### Mishandling of the $925,000 Sale

A dispute lingers as to what, if anything, was done about processing plaintiff's offer during the year between its submission in October 1979 and November 1980. Following the City's version of the facts, the court finds that GSA failed altogether to process the offer and was negligent, as stated by Kallaur in his December 5, 1980 letter accompanying his explanatory statement submitted to the FPRS. The record contains documentation that some action was taken in 1980 to obtain FAA and flood plain clearances. This action appears, however, to have been merely preparatory to sending the City a new OFP based on an updated appraisal. City official Garrity avers that in November 1980 GSA's real estate specialist Jack Burrows told him that the paperwork on the sale had been misfiled, a version of events corroborated by Brooks. Nonetheless, it is undisputed that nothing was done to process the sale before the first appraisal expired in December 1979 and that Burrows was reprimanded for his negligence.

City officials claim without contest from the Government that they frequently contacted both Brooks and Burrows throughout this period from October 1979 to November 1980 and were assured repeatedly that there was no problem, that the sale was being processed, and that the lot would be conveyed to the City for $925,000. Although Brooks testified that he did not recall any such communications, defendant concedes that Burrows and Brooks assured the City that the sale was being processed. Garrity avers that had the City been informed that the GSA was not processing the offer, City officials "would have taken any and all steps necessary to correct that situation." This claim of reliance on assurances from GSA that the sale was being processed forms a second basis of plaintiff's claim that the Government should be estopped to deny a sale at $925,000.

### The $1,375,000 OFP

On November 19, 1980, at real estate specialist Burrows' instigation, Kallaur sent the City a new OFP inviting an offer to purchase the lot for $1,375,000 based on an updated appraisal. Kallaur acted under the misapprehension that the City had never returned the first OFP, although defendant contends that Kallaur correctly stated in his cover letter, "During the period between the submission of your original offer and your decision not to seek to acquire the property under historic preservation covenants, it became necessary to update the appraisal upon which the original offer was made ...." Defendant elsewhere admits that plaintiff informed GSA that it had decided not to reapply for the historic preservation grant at the same time that it delivered the first OFP on October 9, 1979.

When plaintiff received the second OFP and Kallaur's November 19, 1980 cover letter, city official Garrity telephoned GSA's Burrows to ask what was going on. Defendant disputes Garrity's averment that Burrows told him that the first OFP had been misfiled, yet admits that Garrity went to see Burrows and delivered another copy of the OFP. On November 21 Burrows wrote on a transmittal slip attached to the second OFP, "*Inoperative*—Hold action until further notice from this office." Defendant questions whether that note was legally authorized as a matter of law.

The matter was then brought to the attention of FPRS Director Brooks and Regional Administrator Kallaur. Kallaur testified in deposition that he decided

> that this had been an administrative error, a grotesque error, on the part of the Regional Office, that we had failed to discharge our responsibilities properly and that we were obligated to follow through under the terms of the original agreement and to advise [the FPRS and the Administrator] that we had made this mistake and proceed to forward an explanatory statement capturing the error and our proposed correction.

Kallaur and Brooks decided that GSA could and should process the sale at $925,000 and thus ratified Burrows' putting a hold on the second OFP. Again, defendant challenges the authority of Kallaur and Brooks to make such a decision.

On December 5, 1980, Kallaur sent an explanatory statement, pursuant to 41 C.F.R. § 101–47.304–12(a), (d),[5] to the FPRS explaining what had happened. Kallaur advanced his belief that the original offer was still valid and recommended a sale at $925,000. Attached was a GSA form signed by Kallaur requiring the signature of the GSA Administrator below the legend,

> Authority granted to accept the offer on or after 35 days from the date of the letters [sent to the Chairmen of the Senate and House Committees on Government Operations] and thereafter to consummate the negotiated sale, unless otherwise instructed or antitrust clearance is required.

Defendant considers this form decisive on the issue of the Regional Office's authority to accept the City's offer and also interprets 41 C.F.R. § 101–47.304–12(d), see supra note 5, to require the Administrator's approval before an offer may be accepted.[6]

Several days after the matter was brought to the attention of Brooks and Kallaur, Brooks told the City's Garrity that the second OFP (covered by Kallaur's November 19 letter) had been sent by mistake, and assured him the $925,000 sale would be "put back on track." Defendant, however, deems Brooks' authority to give such assurance a question of law. Moreover, defendant disputes plaintiff's contention that no one from GSA informed the City that a $925,000 sale would violate statute or internal GSA rules. Defendant cites the November 19 letter, which stated that between October 9, 1979, when the offer was submitted, and "your decision not to seek to

acquire the property under historic preservations covenants" (also on October 9, 1979), "it became necessary to update the appraisal upon which the original offer was made . . . ." Of course, this was the November 19 letter that GSA's Brooks told City official Garrity had been sent by mistake. Defendant also argues that the statutory requirement for sale at fair market value was a matter of public notice and that the alleged illegality of a sale based on an expired appraisal rendered immaterial GSA's alleged failure to inform plaintiff that such a sale was illegal. In any event, it is undisputed that GSA told plaintiff not to take action on the second OFP. This forms the basis of plaintiff's attempt to estop the Government from denying the existence of a contract to sell at $1,375,000.

### Failure of the $925,000 Sale

During 1980–81 the FPRS was headed by Commissioner Roy Markon ("Markon"), who had approved the original disposal plan in May 1979. This official refused to forward Regional Administrator Kallaur's December 5, 1980 explanatory statement to Congress on the ground that it was based on an expired appraisal. Defendant adds that the statement also lacked the required clearances. Kallaur defended his view to GSA Acting Administrator Raymond A. Kline, who, after receiving advice from General and Regional Counsel, agreed with Kallaur and on March 19, 1981, ordered an explanatory statement to be prepared proposing to sell the lot for $925,000 and providing a rationale for deviating from the requirement of GSA's internal guidelines that explanatory statements be based on updated appraisals.

---

**5.** 41 C.F.R. § 101–47.304–12 (1982), provides, as it did in 1979–81, in pertinent part:

> (a) Subject to the exceptions stated in § 101–47.304–12(b), the disposal agency shall prepare an explanatory statement, as required by section 203(e)(6) of the Act, of the circumstances of each proposed disposal by negotiation.
>
> \* \* \* \* \* \*
>
> (d) Each explanatory statement when prepared shall be submitted to the Administrator of General Services for review and transmittal by the Administrator of General Services by letters to the Committees on Government Operations . . . .

\* \* \* \* \* \*

> (f) In the absence of adverse comment by an appropriate committee . . . on the proposed negotiated disposal, the disposal agency may consummate the sale on or after 35 days from the date of . . . [submission of the explanatory statement].

**6.** Although the Regional Office has delegated authority over the disposal of surplus realty, PBS 4000.1–113e, provides in part: "No negotiated offer requiring the submission of an explanatory statement to the appropriate committees of the Congress shall be accepted without the prior approval of the Central Office. . . ."

Markon renewed his attempts to convert Kline to his viewpoint. On May 7, 1981, Kline discussed the case with the Chairman of the House Committee on Government Operations and a staff member. The staff member later contacted Kline, after having reviewed the file and, according to Kline's deposition testimony, expressed doubt that the committee would approve the sale if it were submitted for review because the appraisal period had expired. Kline then abandoned his plan to waive the internal guidelines, concluding that the House committee would obstruct a $925,000 sale.[7] By June 1981 Gerald B. Carmen ("Carmen") had assumed office as Administrator of GSA, but he directed Kline to continue handling the sale of the lot. After again contemplating in late June 1981 submission of an explanatory statement based on the $925,000 price, despite the likelihood of congressional opposition, on August 3, 1981, Kline finally ordered Markon to conduct the sale based on a current appraisal according to the guidelines.

On August 25, 1981, City officials met with Administrator Carmen and argued for a sale at the original price. The GSA did not disclose its earlier decision not to proceed with a sale at $925,000. During a November 13, 1981 meeting, GSA informed the City that it would not convey the lot for $925,000. GSA returned plaintiff's deposit without interest on November 20 and sent plaintiff a new OFP for $1.5 million on February 24, 1982. The City purchased the property at that price, having first filed a suit in federal district court seeking specific performance of the $925,000 contract. The suit was transferred to this court in November 1982.

## DISCUSSION

### The Express Contract Issue

Plaintiff argues that GSA had made the City an offer to sell the property, based on

instances in which GSA personnel referred to the Government's invitations to offer as "offers", and that at the August 6, 1979 meeting the parties achieved the requisite meeting of the minds. Defendant erects as barriers to formation of a contract arguments that the OFP was an offer by the City, so that it was not capable of acceptance by the City, and that the GSA officials lacked authority to agree to a binding contract. According to defendant, no contract came into existence because, absent congressional review, GSA's offer could not be accepted. The City contends that although 41 C.F.R. § 101–47.304–4 "does state that the GSA issues 'invitations to make an offer,' this procedure is *not* required by statute and, we submit, was not as a matter of fact and substance followed in this case." Plf's Reply at 19 (emphasis in original).

The regulatory scheme for disposals of surplus property by negotiation is designed to give the greatest protection to the public coffers from disadvantageous bargains struck by GSA. The quoted regulation does more than state that the GSA issues such invitations, but prescribes: "In *all* advertised and negotiated disposals, the disposal agency *shall* prepare and furnish ... written invitations to make an offer, which shall contain ... all the terms and conditions under which the property is offered for disposal ...." (Emphasis added.)

■ Although the City presents several indications that GSA made an offer, both the OFP and the City Council resolution specified that the City was making an offer. These unequivocal manifestations that an offer was being made by the City, which were signed by authorized city officials, preclude transforming that offer into an offer by GSA that was accepted by the City.[8] In *Russell Corp. v. United States,* 210 Ct.Cl. 596, 537 F.2d 474 (1976) (per

---

7. Kline testified, "After they reviewed the file and it was communicated back to me what their conclusion was, it was at that point that I thought it would be useless to go up there and be shot down anyway."

8. The discussion concerning lack of authority, *see infra* at pp. 12–13, disposes of plaintiff's argument that representations by GSA officials could convert the OFP to an offer by the GSA.

curiam), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977), the Court of Claims held that a contract did not come into existence in circumstances similar to this case. The GSA Administrator in *Russell Corp.* had approved the sale, but no representative of the Government had executed the acceptance page. That the offer was not accepted by the authorized signature defeated a claim based on express contract. 210 Ct.Cl. at 608, 537 F.2d at 481–82; *see Kellerblock v. United States,* 219 Ct.Cl. 608, 611, 618 F.2d 119 (1979). *See also Prevado Village Partnership, Etc. v. United States,* 3 Cl.Ct. 219, at 224 n. 3 (1983) (LYDON, J.).

■ Plaintiff's argument that the Regional Office, per Kallaur, had authority to contract does not change the result. In the law of government contracts, no contract can be created binding the Government absent actual authority of the Government's agents to bind the Government. *Federal Crop Insurance Co. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *accord Prestex Inc. v. United States,* 3 Cl.Ct. 373, at 377 (1983) (LYDON, J.) (citing cases). Thus, the factual issues alleged by plaintiff as to the parties' intentions, states of mind, and understandings do not present themselves if the lack of authority defense prevails.

■ Two impediments exist to a finding of authority here. The first is that the applicable regulation, 41 C.F.R. § 101–47.-304–12(d), quoted *supra* note 5, requires that the Administrator review and transmit the explanatory statement to the congressional oversight committees.[9] After Kallaur approved the sale at $925,000, Acting Administrator Kline never transmitted the explanatory statements; nor did he sign, or authorize to be signed, the OFP or Kallaur's request for authority to accept the OFP. Thus, Kallaur lacked authority to bind the Government. Although Kline had authority to commit GSA, after his rebuff by the House Committee Kline withdrew his assent by declining to execute Kallaur's request or to continue processing the $925,000 OFP. *See Russell Corp.,* 210 Ct.Cl. at 608, 537 F.2d 474.

The second impediment to an authorized acceptance is the requirement of congressional review itself. Congressional comment is not a ministerial act, merely part of the mechanics of processing the offer. The legislative history cited by defendant reveals numerous instances wherein proposed negotiated sales were stopped and prices revised after congressional intervention. *See* H.Rep. No. 1763, *reprinted in* 1958 U.S. Code Cong. & Ad.News 2861, 2863–66. Although the City is correct that congressional approval is not required—at least technically—notice to Congress is required both by statute, 40 U.S.C. § 484(e)(6), quoted *supra* note 2, and by regulation, 41 C.F.R. § 101–47–304–12, (a), (d), quoted *supra* note 5. Congressional review is referred to explicitly in Form 2041, which accompanied the OFP, although Form 2041 stated only that acceptance "probably" would not occur until after consideration by Congress. Under the procedure for contracting in this case, as prescribed by statute and regulation, congressional review is a step that must be completed before acceptance. *See Empresas Electronicas Walser, Inc. v. United States,* 223 Ct.Cl. 686, 688, 650 F.2d 286 (1980); *Russell Corp.,* 210 Ct.Cl. at 609, 537 F.2d at 482.

### The Implied-in-fact Contract Issue

■ In its briefs, and fairly noticed in its complaint, the City advanced a claim based on contract implied in fact. Judge Harkins has provided a full current discussion on the parameters of this court's jurisdiction to entertain such a claim. *Pacific Gas & Electric Co. v. U.S.,* 3 Cl.Ct. 329, at 338–339 & nn. 5–11 (1983) (citing cases); *see Hargrove v. United States,* 1 Cl.Ct. 228, 230 (1982) (MILLER, J.). In brief, this court will recognize as an implied-in-fact contract one

---

**9.** This regulation is sufficient to charge the City with notice of Kallaur's lack of authority finally to bind the GSA. That GSA's more explicit requirement of the Administrator's prior approval for acceptance, PBS 4000.1–113e, quoted *supra* note 6, is unpublished therefore does not diminish the chargeable notice.

founded on the requisite meeting of the minds, which is inferred from the parties' conduct in light of the surrounding circumstances.

Although in an implied-in-fact contract the presence of a manifestation of assent is the overriding factor, two defects preclude a conclusion that a contract implied in fact existed in the circumstances of this case. The first is Kallaur's lack of authority, which has been treated previously. *See Prestex, Inc.,* 3 Cl.Ct. at 377 (citing cases); *Hargrove v. United States,* 1 Cl.Ct. at 230. The second is that the parties were chargeable with knowledge of additional actions under statute and regulation that had to be accomplished before a contract could come into existence. *See Prevado Village Partnership, Etc.,* 3 Cl.Ct. at 223–225; *Russell Corp.,* 210 Ct.Cl. at 612, 537 F.2d at 483.

Plaintiff has failed to adduce any facts that would require a trial on the existence of a contract implied in fact.

*The Constitutional Issue*

Incident to oral argument, the court requested that the parties address the applicability of *INS v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), to the case at bar. The statute held unconstitutional in *Chadha* authorized a unicameral veto of the Attorney General's decision, upon delegated authority from Congress, to allow deportable aliens to remain in the United States. *Chadha* already has been extended to invalidate legislative vetoes of agency rulemaking. *Consumers Union of the United States, Inc. v. FTC,* 691 F.2d 575 (D.C.Cir.1982) (per curiam), *aff'd mem.,* —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1403 (1983); *Consumer Energy Council of America v. FERC,* 673 F.2d 425 (D.C.Cir.1982), *aff'd mem.,* —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983).

The pertinence of *Chadha* to this case is that defendant has argued that because the congressional review procedure was not undertaken, consummation of a contract was never authorized. On the other hand, Kline, GSA's Acting Administrator, by ordering preparation of an explanatory statement waiving the requirement of a current appraisal, as recommended by Kallaur, manifested assent to the formation of a contract at $925,000. Kline thereby ratified Kallaur's decision, communicated to the City by Brooks, to proceed with consummating the sale. *See Thomson v. United States,* 174 Ct.Cl. 780, 357 F.2d 683 (1966). Alternatively, Kline was authorized to approve the explanatory statement and thereby assent directly, not as a ratifier. Kline was inhibited from submitting the explanatory statement and expressly authorizing acceptance only by his expectation of congressional disapproval. The question thus becomes whether congressional review was a valid prerequisite for contract formation.

Involved in *Chadha* was section 244(c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(c)(2) (1976), which derived from Congress' authority under U.S. CONST. art. I, § 8, cl. 4 "To establish an uniform Rule of Naturalization." Section 244(c)(2) in substance allowed either House of Congress to disagree by resolution with the decision of the Attorney General not to deport an alien and bound the Attorney General to the decision of either House.

In this case the statute in question, 40 U.S.C. § 484(e)(6), quoted *supra* note 2, derives from Congress' plenary authority over public lands in art. IV, § 3, cl. 2, and merely provides that prior to disposal by negotiation of certain real property an explanatory statement must be transmitted to the appropriate committees of Congress. The implementing regulation, 41 C.F.R. § 101–47.-304–12(a), (d), (f), quoted *supra* note 5, requires submission of the explanatory statement and permits GSA to consummate a sale in the absence of adverse comment by an appropriate congressional committee or subcommittee. This case thus does not involve an explicit veto by one House of Congress; rather, a procedure established by statute, regulation, and practice is presented whereby one committee of one House of Congress can intervene in and stop a decision of the Executive Branch to contract.

Compelling similarities between this case and *Chadha,* however, are apparent. Here, GSA was required to submit for congressional review a contract for a negotiated sale of surplus property prior to consummating the transaction. In practice, as GSA's then-acting administrator Kline testified, the proposed sale would not be consummated without receiving the approval of the House oversight committee. As Kline put it, after having received a preview of disapproval from a committee staff member, "I thought it would be useless to go up there and be shot down anyway." The Acting Administrator deemed himself bound by the requirement of submitting a proposed sale for congressional review to defer to the committee's decision, and GSA's regulations so restricted him. 41 C.F.R. § 101–47.304–12(f) (quoted *supra* note 5).

Assuming, however, that another GSA Administrator were of a different view and regarded the comment of the House committee as purely advisory, Congress would not countenance GSA's going forward. The legislative history to the 1958 amendments to the Federal Property Administrative Services Act of 1949 reveals a number of instances wherein Congress demonstrably viewed its role as one of intervention for the purpose of objecting to proposed sales, primarily due to disagreement with appraisal values. H.Rep. No. 1763, 1958 U.S.Code Cong. & Ad.News at 2863–66.[10] Congress' objections were honored in these instances, and higher sales prices were obtained. Defendant also admits that GSA defers to the congressional recommendation. Def's Reply at 12, 14. Finally, Kline testified plausibly that the spectre of oversight hearings dissuades independent action by the agency when congressional approval is withheld. In practice, then, one House of Congress, by committee, can veto a proposed sale by the Executive Branch to which Congress, pursuant to art. IV, § 3, cl. 2 of the Constitution, has delegated its authority to dispose of public property.

On September 23, 1983, the Department of Justice filed a brief through its Lands and Natural Resources Division, the same arm of defendant involved in the case at bar, in *National Wildlife Federation v. Watt,* 571 F.Supp. 1145 (D.D.C.1983). Plaintiff sought to enjoin the Secretary of the Interior from issuing certain coal leases after Congress, pursuant to section 204(e) of the Federal Land Policy and Management Act of 1976, Pub.L. No. 94–579, 90 Stat. 2753 (codified at 43 U.S.C.A. § 1714(e) (West Supp.1983)),[11] requested that the leases be withheld temporarily. The statute requires the Secretary to withdraw a proposed lease upon notification from a designated committee of either House of Congress that an emergency exists and that

---

**10.** The House Report also characterized the requirement to report thusly:

Reporting is viewed merely as a procedure for informing Congress of deviation from the customary method of publicly advertised competitive disposal. The function of the committee has not been one of approving or disapproving each negotiated sale submitted to Congress, but rather has been one of general review and of registering objection when it seems apparent that the proposed sale is not in the best interest of the Government. *Id.* at 2867. The preceding portions of the House Report to which citation is made in the text are in marked opposition to the quoted language.

**11.** 43 U.S.C. § 1714(e) provides in full:

Emergency withdrawals; procedure applicable; duration

When the Secretary determines, or when the Committee on Interior and Insular Affairs

of either the House of Representatives or the Senate notifies the Secretary, that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost, the Secretary notwithstanding the provisions of subsections (c)(1) and (d) of this section, shall immediately make a withdrawal and file notice of such emergency withdrawal with the Committees on Interior and Insular Affairs of the Senate and House of Representatives. Such emergency withdrawal shall be effective when made but shall last only for a period not to exceed three years and may not be extended except under the provisions of subsection (c)(1) or (d) of this section, whichever is applicable, and (b)(1) of this section. The information required in subsection (c)(2) of this subsection shall be furnished the committees within three months after filing such notice.

extraordinary measures must be taken to preserve values that otherwise would be lost. The provision is similar to the statute, regulation, and practice in this case, because it allows Congress to study a proposed action before final commitment ensues.[12]

In *National Wildlife Federation,* the Government put forth a position to which this court deems it bound in arguing the constitutionality of review procedure in this case: "The *Chadha* decision ... requires that a provision purporting to authorize a mere congressional committee to alter the duties of the Executive ... be held unconstitutional, even more so than it required the invalidation of a one-House veto provision ...." Govt's Suppl.Br., filed Sept. 26, 1983, at 6. The Government attacked the decision of the district court in *Pacific Legal Foundation v. Watt,* 529 F.Supp. 982, 1004 (D.Mont.1982), that the Secretary of the Interior's discretion to modify the committee's action by dictating the scope and duration of a lease withdrawal saved the constitutionality of the veto provision. The Government argued that *Pacific Legal Foundation* is invalid after *Chadha:* The Supreme Court's decision "does not leave any room for such legerdemain in statutory construction." Gov't Br., filed Sept. 23, 1983, at 23. The Supreme Court in *Chadha* held that the bicameral and presentment requirements of art. I, § 1, § 7, cls. 2, 3 applied to Congress' exercise of its authority under art. I, § 8 to establish a uniform rule of naturalization. Defendant argued that the rationale is applicable equally to Congress' exercise of its article IV powers. The court agrees with the Government's position in *National Wildlife Federation.*

Moreover, the Supreme Court's opinion in *Chadha* certainly did not bless the practice of unicameral intervention in sales of surplus government property by refusal to review a proposed sale or disapproval or withheld approval of such a sale:

> The Constitution provides Congress with abundant means to oversee and control its administrative creatures. Beyond the obvious fact that Congress ultimately controls administrative agencies in the legislation that creates them, other means of control, such as durational limits on authorizations and formal reporting requirements, lie well within Congress' constitutional power.

103 S.Ct. at 2786 n. 19. One of the two authorities cited for this proposition, Javits & Klein, *Congressional Oversight and the Legislative Veto: A Constitutional Analysis,* 52 N.Y.U.L.Rev. 455, 462 (1977), specifically discusses reports to Congress after an action has been taken:

> Methods such as reporting requirements and congressional committee investigations allow Congress to scrutinize the exercise of delegated lawmaking authority, but they do not permit Congress to retain any part of that authority once it has been delegated. *None of these methods effectively enables Congress to review executive proposals before they take effect; none affords the opportunity for ongoing and binding expressions of congressional intent.*

Javits & Klein, *supra,* at 461–62 (emphasis added). Kaiser, *Congressional Action To Overturn Agency Rules: Alternatives to the 'Legislative Vetos,'* 32 Ad.L.Rev. 667 (1980), is to the same effect.

The Supreme Court in *Chadha,* however, did sanction traditional "report and wait" provisions whereby Congress reserves to itself the opportunity to review proposed action before it becomes effective and to pass legislation barring its effectiveness if the proposal is found objectionable. 103 S.Ct. at 2776 n. 9 (citing *Sibbach v. Wilson,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1944)).

---

12. Judge Oberdorfer granted preliminary injunctive relief in *National Wildlife Federation* on nonconstitutional grounds and distinguished *Chadha* as not reaching the exercise under art. IV of Congress' allegedly proprietary, as opposed to legislative, role with respect to public lands. *National Wildlife Federation,* 571

F.Supp. 1145 (D.D.C.1983) (order granting preliminary injunction). This distinction would exempt legislation under art. IV, § 3, cl. 2 from the requirements of bicameralism and presentment because Congress is deemed a custodian of all public lands.

The statute, regulation, and congressional and agency practice in this case do not simply reserve to Congress an opportunity to pass legislation barring the proposed sale. What is reserved is the power to disapprove or to withhold approval without passing legislation. The statute, regulation, and practice are not tantamount to a "report and wait" provision or practice.

This constitutional inquiry becomes pivotal because Acting Administrator Kline testified that, if the City's offer had not been waylaid before the first appraisal expired, the proposed contract would have been processed in the normal fashion and been approved administratively. Kline has also testified that he would have approved an explanatory statement recommending that the resurrected offer be accepted. Hence, the sale, but for Kline's being advised that the House committee would not approve it, would have gone forward. Because the requirement of review by Congress is unlawful, the obstacle to contract formation disappears. Kline, the decision maker who had authority to bind GSA, is no longer inhibited by the need for congressional review and has manifested his assent, thereby ratifying Brooks' advice to the City. The contract, implied in fact, then can be enforced by the court.

 The court has considered carefully defendant's arguments [13] and holds that the practice of a committee of the House of Representatives of intervening in and stopping negotiated sales of surplus property proposed by the GSA is an unconstitutional invasion of the separation of powers. Without intervening and stopping a proposed sale, the only way Congress could override the GSA disposal decision would be by enacting further legislation. The action of the House Committee on Government Operations essentially was legislative in purpose and effect and thus was subject to the procedural requirements of art. I, § 7, cls. 2–3 of the Constitution—passage by a majority of both Houses with presentment to the President. As a result of the foregoing, the court holds that GSA is bound to a contract implied in fact to convey the subject property to the City for $925,000.

Reaching the constitutional question is unavoidable. The court is required to address the issue only because the City fails in its claims based on express contract, implied in fact contract—not impacted by constitutionality, and estoppel. *See New York City Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979); *Spector Motor Service, Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). The court's disposition of the estoppel claims follows.

*The Estoppel Issues*

Plaintiff grounds its claim to estop defendant to deny the existence of a $925,000 contract on two representations by the Government: 1) Kallaur's letter of August 7, 1979, and related representations, advising the city that if it submitted the necessary documents he would proceed with the sale, *see supra* note 3; and 2) Brooks' and Burrows' representations to city officials during the period October 1979 to November 1980 that the $925,000 OFP was being processed. Estoppel as to the $1,375,000

---

**13.** The Chairman of the House Committee on Government Operations did not seek to intervene in these proceedings after the court directed the parties to address the applicability of *Chadha* in argument. The Chairman of the House Committee on Interior and Insular Affairs intervened in the *National Wildlife* litigation because the Justice Department argued that 43 U.S.C. § 1714(e) was unconstitutional. Although the Department of Justice's interest was adverse to that of Congress with respect to the statutes and regulations in the *Chadha* and *National Wildlife* cases, the Department views the practice under the statute and regulation in this case as not constitutionally offensive.

Interestingly, the Chairman, as intervenor in *National Wildlife,* argued: "[I]f Section 204(e) were viewed as a means of sharing the administration of the wilderness and public lands with the executive on an ongoing basis, the Ninth Circuit's *Chadha* decision would mandate a finding that section 204(e) was unconstitutional...." Intervenor's Memo in Support of Summary Judgment, filed Sept. 27, 1983, at 7. A shared administration of the disposal by negotiated sale of surplus government property is a precise description of Congress' and the GSA's interaction in this case.

contract is based on realty specialist Burrows' advice to the City, endorsed by Brooks and Kallaur, not to take any further action to complete and submit the second OFP because the $925,000 OFP was still viable.

■ The doctrine of equitable estoppel also has been explicated recently by Judge Harkins in *Pacific Gas & Electric Co.,* 3 Cl.Ct. at 340–341 & nn. 12–15 (citing cases); *see Biagioli v. United States,* 2 Cl.Ct. 304, 308 (1983) (NETTESHEIM, J.). In order to estop the Government, the conduct or representations relied upon must be made by government officers acting within the scope of their authority. *Jackson v. United States,* 216 Ct.Cl. 25, 41, 573 F.2d 1189, 1197 (1978); *Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973) (citing cases). Kallaur's lack of authority, which was fatal to plaintiff's claim for a contract implied in fact, similarly dooms any estoppel to deny that GSA accepted the City's offer or that a contract otherwise existed based on his letter and other representations of similar effect. *E.g., Prestex, Inc.,* 3 Cl.Ct. at 379; *see Pacific Gas & Electric Co.,* 3 Cl.Ct. at 340–341. In *Manloading & Management Associates, Inc. v. United States,* 198 Ct.Cl. 628, 635, 461 F.2d 1299, 1302 (1972), relied on by plaintiff, the contracting officer was authorized expressly to bind the Government in the manner that plaintiff sought to bind it by estoppel.

As to the other leg of the estoppel claim on the $925,000 OFP—the misrepresentations concerning ongoing processing—defendant has conceded that the representations were authorized. As to the estoppel based on Burrows' instruction not to proceed on the $1,375,000 OFP, defendant has failed to adduce any evidence that the instruction was unauthorized.[14] Although Burrows was not authorized to accept or reject an OFP, he had implied authority to give the City instructions regarding the for-

malities and paperwork involved in concluding the transaction. Such authority was inherent in his job as the agent responsible for processing the transaction. The authority question evaporates because Brooks and Kallaur, Burrows' superiors, determined to press forward with the $925,000 OFP when they learned why the $1,375,000 OFP had been sent, and Brooks informed the City of this decision. These officials were authorized, at a minimum, to sponsor (as opposed to accept) an OFP, even one flawed by an expired appraisal.

■ Four additional elements are necessary for equitable estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. *Emeco Industries, Inc.,* 202 Ct.Cl. at 1015, 485 F.2d at 657. The second element is sometimes expressed as a requirement that the party asserting estoppel have changed his position in reliance on the conduct or acquiescence of government officers, *see Russell Corp.,* 210 Ct.Cl. at 614, 537 F.2d at 485, or have had a reasonable right to act in reliance on defendant's actions or inactions. *United States v. Georgia-Pacific Co.,* 421 F.2d 92, 98 (9th Cir.1970); *Emeco Industries, Inc.,* 202 Ct.Cl. at 1017, 485 F.2d at 658.

An inquiry therefore must be made whether plaintiff, having shown the requisite authority, satisfies the other four requirements to perfect an estoppel as to either the $925,000 or $1,375,000 OFP.

With respect to the $925,000 OFP, the City has failed to show that it acted to its injury based on the representations of Brooks and Burrows that the OFP was being processed. The City, as the party urging estoppel, must show that it reasonably relied on the representations to its detriment in order to satisfy the fourth element.

14. Because an estoppel based on representations by Kallaur is defeated by lack of authority, it becomes unnecessary to consider the City's argument that it acted in reliance thereon and suffered detriment by submitting the

OFP and deposit and later believing the Brooks/Burrows representations that the OFP was being processed. The court considers these arguments to be sufficiently dealt with by the discussion *infra* at pp. 23–25.

Because city officials were misinformed that the offer was being processed, the City argues that it forfeited the opportunity to telephone the GSA officials and have the processing of the OFP put back on track before the first appraisal expired in mid-December 1979 or to institute a lawsuit under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (1976), to require the GSA to act within a reasonable time. The City also claims loss of the use of its $92,500 earnest money deposit, as well as the lost opportunity to purchase at $925,000, as a consequence of defendant's representations.

The first two alleged detrimental consequences are speculative. Even assuming, *arguendo,* that the City could have prodded GSA or secured judicial relief through legal action before the appraisal expired, speculation is invited as to the OFP's fate in the congressional review process. The record is replete with GSA officials' best guesses that congressional review based on a current appraisal would be a mere formality. These opinions qualify as neither admissions nor expert opinions. Congressional action in this case simply is not capable of prediction, even if it could be shown that Congress has acted habitually in a certain fashion. The House Report itself demonstrates that Congress does not always deem current appraisals of estimated fair market value to be reliable.

As to the $92,500 earnest money deposit, *Russell Corp.* gives some comfort to plaintiff regarding the claim based on the failure to return the deposit "promptly after it was recognized that the deal could not go forward." *See* 210 Ct.Cl. at 614, 537 F.2d at 485. Defendant rejoins that the City insisted, after learning the fate of the $925,000 OFP in November 1980, that its offer at that figure continue to be considered and therefore should not be heard to complain. Suffice it to say that the City's deposit was not returned promptly when the 1981 efforts to resuscitate the original OFP floundered. Nonetheless, lost

use of this sum is not considered a detriment because an earnest money deposit implies by its purpose uncertainty as to whether there will be a contract at all and acceptance of the concomitant risk that one may lose the use of one's money.

Finally, loss of "a good piece of business" does not constitute detriment. *Russell Corp.,* 210 Ct.Cl. at 614, 537 F.2d at 485. The City apparently contends that the loss of the more favorable contract at $1,375,000 constitutes detriment on that claim. This claim fails for the same reason.

In most of the cases cited by plaintiff, the parties incurred considerable expenses acting in reliance on government conduct. *See Broad Avenue Laundry & Tailoring v. United States,* 681 F.2d 746 (Fed.Cir.1982) (increased wages paid to employees by contractor); *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (plaintiff improved forest land relying on Government's abandonment of claim thereto); *Merchant's National Bank v. United States,* 689 F.2d 181 (Ct.Cl. 1982) (bank financed sale of buoys to Government, relying on buoys having passed government inspection); *Emeco Industries, Inc.,* 202 Ct.Cl. 1006, 485 F.2d 652 (expenses incurred preparatory to performance under contracts with Government); *Dana Corp. v. United States,* 200 Ct.Cl. 200, 470 F.2d 1032 (1972) (extra expense incurred in packaging equipment furnished Government); *Manloading & Management Associates, Inc. v. United States,* 198 Ct.Cl. 628, 461 F.2d 1299 (same as *Emeco* ); *Pacific Far East Lines v. United States,* 184 Ct.Cl. 169, 394 F.2d 990 (1968) (unprofitable contract entered into in reliance on Government's previous inclusion of such contracts in excess profit calculations under subsidy contract with Government); *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 98 F.Supp. 757, *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951) (contract performed fully).[15]

■ The court concludes that no detriment was suffered because of the uncertainty of receiving congressional approval

---

15. Several of the cases cited by plaintiff do not conform to the pattern. *Corniel-Rodriguez v. INS,* 532 F.2d 301 (2d Cir.1976); *United States*

*v. Wharton,* 514 F.2d 406 (9th Cir.1975); *Brandt v. Hickel,* 427 F.2d 53 (9th Cir.1970). These cases recognize as detriment serious or

and because the lost use of the earnest money deposit and the loss of the contract do not constitute sufficient detriment in the circumstances of this case. The City therefore cannot succeed on its claims for equitable estoppel.

## CONCLUSION

Defendant's motion for summary judgment on the existence of an express contract is granted, but is moot; plaintiff's motion for summary judgment based on estoppel is denied, and defendant's cross-motion is granted, but is moot. Plaintiff's oral motion for summary judgment based on a contract implied in fact is granted, and the Clerk of the Court shall enter judgment for plaintiff in the amount of $575,000.[16]

IT IS SO ORDERED.

Costs to the prevailing party.[17]

## ORDER

### On Motion For Rehearing

NETTESHEIM, Judge.

Pursuant to RUSCC 59(a)(1), (e), defendant has moved, over plaintiff's objection,

for a rehearing or an amendment of the judgment entered on October 21, 1983, upon this court's opinion granting summary judgment in favor of plaintiff based on a contract implied in fact for the purchase of real property.

Defendant contends that the court found an implied in fact contract where none in fact could exist; that the court found a constitutional impediment to the sale of the real property when the court had no occasion to reach the issue and when in any case no such impediment existed; and that the court ruled on issues which the parties were never given an opportunity to brief and which have far-reaching implications. Lastly, defendant requests reconsideration of the award of costs to plaintiff. The third and fourth points previously were addressed in the court's order of November 2, 1983, which, *inter alia,* allowed defendant to file its Rule 59 motion out of time.[1]

In cases such as the one at bar, this court has been directed by its predecessor court "to consider motions for rehearing with ex-

---

manifest injustice as a consequence of the Government's conduct. Although *Wharton* has superficial similarity on the facts, plaintiffs there stood to lose the farm on which they had lived for 50 years. The City ultimately lost only a prospective acquisition. As shown by the cases discussed in the text, the Court of Claims adopted a more stringent standard for detrimental reliance to which this court deems itself bound. *See Biagioli,* 2 Cl.Ct. at 308.

16. Plaintiff's claim for interest on the earnest money deposit must fall before the prohibition of 28 U.S.C. § 2516(a) (1982). *See Pacific Coast Medical Enters., Inc. v. United States,* 3 Cl.Ct. 140, 145 (1983) (NETTESHEIM, J.) (citing cases), *appeal docketed,* No. 83–1426 (Fed. Cir. Sept. 27, 1983).

17. By its amended complaint, the City did not ask for attorneys' fees. Although this court does not intend to foreclose plaintiff from making an application pursuant to 28 U.S.C. § 2412(d) (Supp. V 1981), assuming that plaintiff qualifies, the foregoing strongly indicates that the Government's litigating position was reasonable in light of all the pertinent facts. *See Gava v. United States,* 699 F.2d 1367, 1370 (Fed.Cir.1983). The dispositive Supreme Court decision was brought to the parties' attention only after briefing was completed.

1. Defendant claims that it was not given an opportunity to brief the constitutional issue before decision (defendant previously had briefed the issue of a contract implied in fact). In *General Electric Co. v. United States,* 189 Ct.Cl. 116, 117–18, 416 F.2d 1320, 1321–22 (1969) (en banc per curiam), the Court of Claims stated:

Where a new and separate issue is raised *for the first time* in the court's opinion and there decided, a petition for reconsideration (or other post-decision relief) addressed to that question will be approached hospitably because the parties may not have had a fair opportunity to argue or litigate the point. . . . But where a party adversely affected by the court's decision on the issue has had fair notice that the question may well be in the case, has had a fair chance to present its position, has failed to do so, and gives no sufficient excuse for its failure, a demand for post-decision relief will normally be rejected. We point out specifically that a new issue or subject can be raised by queries from the bench, and counsel should be alert to this, particularly if the queries are repeated or insistent. A party who feels that the record or briefing, as they stand, inadequately presents his position on that matter should so inform the court at the argument or promptly thereafter; at the argument he can

ceptional care." *Carter v. United States,* 207 Ct.Cl. 316, 318, 518 F.2d 1199 (1975) (per curiam) (citing *General Electric Co. v. United States,* 189 Ct.Cl. 116, 117, 416 F.2d 1320, 1321 (1969) (en banc per curiam)). Two ancient cases establish the tenor for examining a Rule 59 motion based on alleged legal error, as in this case. The Court of Claims stated in *Roche v. District of Columbia,* 18 Ct.Cl. 289, 290 (1883), on a motion for a new trial:

> The reargument of cases cannot be permitted upon the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged, with no more satisfactory results, as there would still be a losing party in the end.

The court in *Roche* referred to *Calhoun v. United States,* 14 Ct.Cl. 193 (1878), as to the circumstances for granting a motion for new trial:

> [W]e apprehend that he [counsel] imagines that our decision was made, not under a mistake of fact, but under a mistake of law. When such a mistake appears in the record, a party may take advantage of it on appeal, when the case is appealable; but when it does not appear in the record, his remedy lies in a motion for review.

14 Ct.Cl. at 198.

Essentially, defendant argues that the court erred as a matter of law with respect to the constitutional issue and as to the legal conclusions drawn based on the evidence of record with respect to the constitutional and contract issues. Were this other than a case wherein defendant may have

also ask, if he desires, for leave to file a post-argument memorandum, or promptly after the argument he can file a motion for leave to present such a memorandum. If such a new subject is clearly brought into the case by questions from the bench at the argument, it is not proper practice to wait until after the decision. The court has a right to know before it decides whether the parties have anything further to present.
(Citation omitted; emphasis in original.)

misperceived its opportunity to brief the constitutional issue prior to decision, *see supra* note 1, the motion would be denied summarily because it is directed solely to legal issues in the record.

Each of defendant's arguments has been considered with great care by the court, deprived as it is of plaintiff's comments on the new and revised arguments set forth in defendant's reply.

With respect to the constitutional issue, defendant argues that the statute in question is a "report and wait" provision and does not bear the stigmatizing veto provision that would render it unconstitutional on its face under the Supreme Court's decision in *INS v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Defendant contends, "The clear purpose . . . [of the statute] is to permit the appropriate committees to prepare any necessary legislation to govern the disposal and to attempt to enact that legislation by constitutional means—through bicameral passage and presentment. . . ." Def.'s Reply at 2; *see id.* at 5.

Putting aside the fact that the implementing regulation stipulates that a proposed sale may be consummated if it is not disapproved, a key problem with defendant's view is that it has not been shared by Congress. The legislative history referred to in the court's opinion reveals that the oversight subcommittee utilizes the review procedure to register objection to a proposed negotiated sale of public property. While it is true that the legislative history contains an assertion, cited to by defendant, that the review procedure has also been perceived by Congress as a monitoring device, the language is at odds with the previous discussion of the many instances in

Although the court gave the parties notice in advance of oral argument to be prepared to address the constitutional issue, so that the issue was not "raised by queries from the bench," the court infers that defense counsel may not have realized that the pre-argument notice entitled it to ask for leave to file briefs. To the end of creating a full record on the significant constitutional issue, defendant's Rule 59 motion was permitted to be filed out of time.

which the subcommittee utilized the review period to stop proposed sales. In fact, the language, quoted in the opinion, describes the oversight subcommittee's function as a dual one "of general review and of registering objection when it seems apparent that the proposed sale is not in the best interest of the Government." *City of Alexandria v. United States*, 3 Cl.Ct. 667 at 676 n. 10 (1983).

The legislative history reveals that Congress did not adopt a 30-day advance notice requirement, or a prior approval requirement, because the General Services Administration (the "GSA") had been cooperative in agreeing to more time when required. The explanatory statement was retained in the current statute because it afforded Congress an adequate opportunity for review, including objecting to a proposed sale. The legislative history therefore does not support defendant's contention that Congress itself envisaged the review period as enabling Congress to enact responsive or corrective legislation. Although the statute may be facially inoffensive, in conjunction with the regulation and congressional and agency practice, a *de facto* practice of congressional veto of proposed sales is present.

Defendant also contends that, assuming *arguendo* the unconstitutionality of the statute, regulation, and congressional and agency practice with respect to these proposed sales, no contract could have been formed because the acting administrator lacked authority to approve acceptance, because he did not approve acceptance, because his approval was not communicated to plaintiff (*but see, Thomson v. United States*, 174 Ct.Cl. 780, 357 F.2d 683 (1966)), and because the offer dictated a manner of acceptance—in writing—which obviously did not occur in the circumstances of this case. Defendant argues that the acting administrator lacked authority to waive the requirement of appraisal based on fair market value at the time the proposed sale was transmitted to Congress. It must be remembered, however, that the statute does not prescribe the stage of the contracting process at which fair market value must be determined; nor does the regulation. Only the internal procedure, cited in the court's opinion, requires the appraisal to be current as of the time of submission of the explanatory statement. On advice of agency counsel, the acting administrator determined that this internal guideline could and should be waived.

 Defendant's remaining arguments devolve to the theory that an unlawful condition precedent to contract formation can have legal effect. The veto resulting from the statute, regulation, and practice in this case forestalled the act that would have resulted in acceptance, *i.e.*, a contract signed on behalf of the GSA. The party who seeks to avail itself of the unlawful condition precedent, defendant would argue, thus can elude contract formation by relying on the non-occurrence of subsequent steps, such as manifestation of assent in the manner dictated by the offeror, which did not occur simply because the unlawful condition precedent intervened. Defendant's argument would call for an illogical result and is contrary to basic contract principles. *See* J. Calamari & J. Perillo, *The Law of Contracts* § 11–31 (2d ed. 1977).

 Finally, defendant argues that the Government can avail itself of the law of the state of Virginia with respect to the statute of frauds. Examination of that law, however, is foreclosed to this court by *Penn-Ohio Steel Corp. v. United States*, 173 Ct.Cl. 1064, 1089–90, 354 F.2d 254, 269 (1965), in which the Court of Claims held that federal contracts need not be in writing. This case is binding precedent under General Order No. 1, 1 Cl.Ct. Rule XXI (1982). Even assuming, however, that this court could reexamine *Penn-Ohio,* as defendant urges, and that this court were to conclude that a writing were required, a sufficient writing to memorialize the terms of the sale of land exists in the acting administrator's March 19, 1981 memorandum directing the preparation of an explanatory statement to be forwarded to Congress.

Based on the foregoing,

IT IS ORDERED, as follows:

Defendant's motion for rehearing or to amend judgment is denied.